THE PEOPLE v. WILLIAM PALMER.

[See 96 Mich. 580.]

*Evidence—Refreshing recollection of witness—Criminal law—Homicide—Instructions—Sentence.*

1. It is not error for the counsel for the people in a criminal case, for the sole purpose of refreshing the recollection of one of the people's witnesses, occasion for which is shown, on his redirect examination, to call his attention to his testimony given on a former trial of the case; citing *Beaubien v. Cicotte*, 12 Mich. 459; *McCreery v. Green*, 38 Id. 186, and authorities there cited; *Battishill v. Humphreys*, 64 Id. .518; distinguishing from *Bashford v. People*, 24 Mich. 247, which recognized the above rule, but was based upon the fact that no occasion was shown for refreshing the memory of the witness.

2. A witness for the respondent in a murder case testified that the deceased had tried to hire him to kill the respondent. After admitting on cross-examination that he married his wife from a house of prostitution, the witness was asked if she was a prostitute, and the question, as also another of a similar character, was excluded. And it is held that the story of the witness was such as to render a very rigid cross-examination of his life and character competent; that, there being

nothing to show that the excluded questions were not asked in good faith, they were not of such a character as to justify the holding that they prejudiced the jury.

3. Argumentative requests to charge, covering a question which has been fully argued to the jury, are of doubtful propriety; citing *People v. Crawford*, 48 Mich. 498.

4. In a prosecution for murder, the court, after defining the different degrees of murder, and also manslaughter, and after stating to the jury that, where a crime was divided into degrees, they might acquit of the principal charge and convict of the lesser offense, and that in such a case they should first consider the matter of the higher crime, and then go through the different degrees, withdrew from their consideration the subject of murder in the first degree, the respondent having been acquitted of that offense on a former trial. And it is held that the charge was not misleading and prejudicial in that the court first defined murder in the first degree, and instructed the jury that they should commence with the higher crime.

5. The testimony on the part of the people in a homicide case tended to show that on the day of the shooting the respondent and decedent had some words of dispute in a saloon; that the respondent left the saloon, decedent remaining there, and, after arming himself with a shot gun, returned to the saloon; that the decedent had in the meantime armed himself with a revolver. The respondent claimed that he had no murderous intent at any time. The court instructed the jury that if, after the respondent entered the saloon, he became aware that the decedent was there, and he then formed the intent to take his life, taking into account whatever may have been in his mind as to their past relations, their quarrels, or anything that he may have heard about the decedent's having a pistol, and if he became aware that the decedent was in the back part of the saloon, surrounded by his friends, if he then, even though but a moment before he fired the fatal shot, formed in his mind the purpose of taking decedent's life, and pursuant to that purpose he shot and killed him, that would constitute murder. Objection was made that there was no evidence to support such a theory, and that neither the prosecution nor the defense conducted the trial with reference to it. And it is held that the Court cannot tell what the argument was to the jury; that, if there was any testimony upon which to base the charge, it must be sustained; that there was evidence that, when respondent entered the saloon, he

appeared in his usual manner, and that, when he raised the gun, his countenance changed; that whether this was because he saw decedent, or saw the pistol pointed at him, and whether it was necessary for him then to shoot in self-defense, were all questions for the jury, and made competent the charge complained of, which was given in connection with instructions covering respondent's theories.

6. After the first difficulty in the saloon, and about an hour before the tragedy, the decedent went out of the saloon, and had a conversation with one Bruce and one Poquette, relating to the trouble in the saloon. The respondent stood 150 to 200 feet from decedent. Bruce testified that decedent said he would not be beaten and bruised by that bully; that he was to big for him; that he was not able to fight him, and, furthermore, did not have to; that he had something to aid him, showing a box of cartridges; that he then said to Poquette, in Bruce's presence, "What did you people up in that saloon mean by letting that man abuse me? He is too big for me. I don't want to fight him, and don't intend to. I have got something to protect myself with,"—taking a revolver out of his pocket; that Poquette replied, "I haven't anything to do with your troubles. Didn't I take him to Bay City yesterday to keep him away from you?" And it is held that the statements of the decedent were competent; that it was not only the right but the duty of the prosecution to place this conversation before the jury in so far as it showed the state of mind and disposition towards the respondent; that the admission of the statement of Poquette to the deceased is more doubtful; that the general rule is, however, that the entire conversation is admissible; that it all related to the trouble existing at the time between respondent and decedent; that it is not the rule to include the portion of a conversation which is favorable to a party, and exclude that which may be against him; that the entire conversation was admissible, and the jury might well be trusted with its consideration.

7. Ten days after the conviction, the respondent was sentenced, without being asked, as far as the record shows, what he had to say why judgment should not be pronounced against him, all in the presence of respondent's counsel, who made no objection to the proceeding. And it is held that the propounding of said question was never regarded as essential except in capital cases; that, whatever good purpose this practice may have served in England when parties charged with crime were not allowed counsel, it is now a mere idle ceremony;

but that, even if the sentence were erroneous for this reason, it was not an error upon the trial, but simply one in imposing sentence, for which the respondent would be remanded to be sentenced afresh.

Error to Saginaw. (McKnight, J.) Submitted on briefs March 1, 1895. Decided June 4, 1895.

Respondent was convicted of murder in the second degree, and sentenced to imprisonment in the State prison at Jackson for 25 years. Judgment affirmed. The facts are stated in the opinion.

*John E. Nolan (George W. Weadock, of counsel),* for respondent.

*Fred A. Maynard,* Attorney General, and *E. A. Snow,* Prosecuting Attorney *(F. E. Emerick, of counsel),* for the people.

GRANT, J. For a statement of the issue in this case, we refer to 96 Mich. 580, where a brief statement of the case will be found. On the second trial the respondent was again convicted of murder in the second degree.

1. A witness by the name of Adette was also a witness for the people on the former trial. Upon the redirect examination of the witness, counsel for the people, for the sole purpose of refreshing the witness' recollection, called his attention to his testimony upon the former trial. This was permitted under objection and exception, and is now alleged as error. This practice is too thoroughly established to now be doubted. *Beaubien v. Cicotte,* 12 Mich. 459; *McCreery v. Green,* 38 Id. 186, and authorities there cited; *Battishill v. Humphreys,* 64 Id. 518. Respondent's counsel rely on *Bashford v. People,* 24 Mich. 247. That opinion, we think, recognizes the rule, but was based upon the fact that no occasion was shown for refreshing the witness' memory. In this case there was.

2. Error is next alleged upon the misconduct of the

prosecuting attorney in interrogating the respondent's witnesses upon the cross-examination. All the questions which were incompetent were promptly overruled by the circuit judge. One of the questions was as follows, asked of the respondent himself:

"Then I understand you, if you were walking along with a gun, and you incidentally saw a revolver discharged in your direction, that you would take your gun, and cock it, and fire right into the crowd?"

One Ruby, a witness for the respondent, testified that the deceased, Albert Palmer, had tried to hire the witness to kill William, the respondent. The story was such as to render a very rigid cross-examination of the witness' life and character competent. He admitted that he married his wife from a house of prostitution, and the question was then asked, "Was she a prostitute?" One other question of a similar character was asked, and both excluded. There was nothing to show that the questions were not asked in good faith, and we do not think they were of such a character as to justify the holding that they prejudiced the jury.

3. It is alleged as error that the court refused to give the following specific request on behalf of the respondent:

"In determining which of the brothers was the aggressor, you may also take into consideration the testimony tending to show that, on the date of the tragedy, Albert was under the influence of liquor, and that, when under the influence of liquor, he was ugly and nervous and of quick temper, and that the defendant, up to the instant of the shooting, was in his usual frame of mind, pleasant and good-natured."

The charge is so full and complete, covering every possible ground of defense, that we do not think it was error to refuse this request. Besides, this request was rather in the nature of an argument based upon a portion of the testimony in the case. Undoubtedly, this question was fully argued by counsel to the jury. Such argumentative requests are of doubtful propriety. *Peo-*

*ple v. Crawford*, 48 Mich. 498. But, aside from this, the court specifically called the jury's attention to the acts, conduct, and threats of the deceased, the facts and circumstances surrounding the killing, and their relations prior thereto, and instructed the jury that they were all for their consideration.

4. In the opening part of his charge, the judge defined the different degrees of murder and also manslaughter. He said that, where a crime is divided into degrees, the jury may acquit of the principal charge, and find the prisoner guilty of the lesser offense; and that, when one is so charged, the jury should first consider the matter of the higher crime, and then go through the different degrees. After some further explanations, he withdrew from their consideration the subject of murder in the first degree, since he had been acquitted of that charge on a former trial. It is insisted that the charge is misleading and prejudicial because he first defined murder in the first degree, and instructed them that they should commence with the higher crime. A juror who could be thus misled or prejudiced would not possess intelligence sufficient to justify his sitting as a juror in any case.

5. It is next argued that the court erred in giving the following instruction:

"Now, if, after he entered the saloon, he became aware that his brother Albert was there, and he then formed the intent to take hs brother Albert's life, taking into account whatever may have been in his mind as to their past relations, their quarrels, or anything that he may have heard about Albert having a pistol, and if he became aware that Albert was in the back part of the saloon, surrounded by his friends, *if he then, even though but a moment before he fired the fatal shot, formed in his mind the purpose of taking his brother's life, and pursuant to that purpose he shot and killed him, that would constitute the crime of murder.*"

The precise point urged is that there was no evidence to support such a theory, and that neither the prosecu-

tion nor the defense conducted the trial with reference
to it.   We cannot tell what the argument was to the
jury.   If there is any testimony upon which to base the
charge of the court, the charge must be sustained.   The
respondent claimed that he had no murderous intent at
any time.   There was evidence that, when he entered the
saloon, he appeared in his usual manner, and there was
evidence that, when he raised the gun, his countenance
changed.   Whether this was because he saw his brother,
or saw the pistol pointed at him, and whether it was
necessary for him then to shoot in self-defense, were all
questions for the jury, and made competent the charge
complained of, which was given in connection with
instructions covering the respondent's theories.   The
entire instructions covering this point were as follows:

"Now, if, after carefully considering all the evidence in the
case introduced upon both sides, and after carefully considering
all the facts and circumstances surrounding the tragedy, and the
relations of the accused and the deceased prior to the tragedy,
and taking into account previously uttered threats, if any there
were by either, and taking into consideration any quarrels that
may have been between the brothers, if any, and also taking into
account whether the parties became reconciled and were friends
before this fatal day, and whether they were friends, then, I say,
taking into consideration all of those facts and circumstances,
it would be a subject for the jury to inquire into as to the intent
with which this act was done,—whether it was an act committed
in malice, whether it was an act committed in passion, or whether
it was an act committed under the impulse of fear; and if, after
a careful examination of all those facts that I have called your
attention to, if each juror, looking into his conscience, could say
that he has an abiding conviction, to a moral certainty, of the
defendant's guilt, it would be his duty to convict, because that
would be proving the case by evidence beyond a reasonable
doubt, as defined by the law.

"As has been said, the killing may have constituted man-
slaughter, or it may be entirely excusable, according to the cir-
cumstances, and according to the state of mind with which the
act was committed; and the principal inquiry in this case must
be limited finally to the question of the intent with which this
act was done.   At the danger of repeating, I say that the prin-

cipal inquiry in this case must be limited finally to the question as to the intent with which William Palmer fired that gun on the day of the shooting. If, at any time before the shot from the revolver was fired, William Palmer had formed the intent and purpose in his own mind, with malice aforethought, to take the life of Albert Palmer, then the mere fact that, while he was engaged in issuing this challenge, his brother, knowing of the danger, was able to first pull a revolver, and to discharge it, would not affect the guilt of the defendant. That implies the forming in his mind, before the firing of the fatal shot, of the intent to take his brother's life; and that would be so because the firing in that case upon his part is immediately connected with the previous malicious and willful intent to take his life; and if Albert, seeing his danger, or knowing that William Palmer was coming in his direction, armed with the fatal weapon, and with the challenge upon his lips, was able first to draw his pistol and fire, that act would not affect the guilt of William Palmer.

"If the jury should find beyond a reasonable doubt that, before he fired the fatal shot, William Palmer had formed a settled, premeditated, preconceived, or deliberately formed purpose to take his brother's life, and that in pursuance of that purpose he procured the gun and the cartridges, and loaded the gun, and carried it to the place where the shooting occurred, with the previously formed purpose, with malice aforethought, to there make use of that gun for the purpose of taking his brother's life, that would constitute the crime of murder, and you would be justified and it would be your duty to find the respondent guilty of murder in the second degree. Or if you should find the fact to be beyond a reasonable doubt that in the first intention William Palmer procured this gun for an entirely innocent purpose, and that he loaded it with an innocent purpose, and intended to go hunting an eagle, as testified to by him, but that any time after procuring the gun, or at any time after entering the saloon, he formed a settled, deliberate purpose and intention, with malice aforethought, to take his brother's life, by shooting him with that gun, that would constitute the crime of murder; for if, at the time the shooting occurred, there was present in the mind of William Palmer this malicious purpose and intent to take Albert Palmer's life, then, no matter how quickly it was formed, or how immediately before the shooting it was formed, if it existed in the mind of William Palmer when he fired that shot, and if it was the actuating, moving cause that impelled him to fire that shot, and if you believe from the evidence, beyond a reasonable doubt, giving the respondent at all times the benefit of this presumption of innocence which I have defined, but, notwithstanding that,

you found him so guilty, it would be your duty to find him guilty of murder in the second degree. In other words, the state of facts I have defined would constitute the crime of murder, and you would be justified in bringing a verdict of murder in the second degree.

"In the next place, if, after a consideration of all of this evidence, you do not find from the testimony in this case beyond a reasonable doubt the existence of all the ingredients constituting the crime of murder in the second degree, as I have defined it to you, you should then direct your attention to the investigation of the evidence in the case to see if a crime of lesser degree had been committed by this respondent, and you should endeavor to ascertain and determine if the crime of manslaughter was committed, for the crime of manslaughter, as before stated and defined to you, is an unlawful and felonious killing of another without malice expressed and implied. When one man suddenly kills another in the heat of passion, but without malice, and without a previously settled and deliberately formed purpose to do so, if no such purpose or wicked intent existed at the time in his mind, and in the heat of blood, and inflamed with passion, he suddenly strikes the fatal blow or fires the fatal shot which causes the death of another, if the jury should find the existence of such a state of facts beyond a reasonable doubt, they would be justified in finding the accused guilty of the crime of manslaughter. Manslaughter is perfectly distinguishable from murder, in this: That though the act that causes death be unlawful or willful, though attended with fatal results, yet malice, either expressed or implied, which is the very essence of murder, is to be presumed to be wanting in manslaughter.

"If the jury should reject this evidence, but should find beyond a reasonable doubt, in accordance with the theory of the respondent and his witness, that he procured this gun with the innocent purpose of hunting near Green Point, or hunting for an eagle that he had ascertained was there, that he did not know at the time where his brother was, and that there existed at the time in his mind no intent to do his brother harm, but that, pursuant to his purpose to hunt for this eagle, he went to the saloon of Jerry Noel after the rubber boots and the cartridges and some liquor, and that he was intending, as soon as he had performed his errand there, to proceed upon his hunt, let us see what situation that would present. That assumed that, at the time he entered that saloon, there was no criminal intention in his mind. Now, if, after he entered the saloon, he became aware that his brother Albert was there, and he then formed the intent to take his brother Albert's life, taking into account whatever may have been

in his mind as to their past relations, their quarrels, or anything that he may have heard about Albert having a pistol, and if he became aware that Albert was in the back part of the saloon, surrounded by his friends, if he then, even though but a moment before he fired the fatal shot, formed in his mind the purpose of taking his brother's life, and pursuant to that purpose he shot and killed him, that would constitute the crime of murder. If, however, he did not form any such purpose, but if, seeing the other parties in the saloon, he raised the gun in his hand in the spirit of banter only, and said, 'Where is the man that wants to shoot me? Come up, come up,' and approached the party, and if, while ₙe was doing that in friendliness and in play, he saw his brother, and saw the revolver in his hand, and if that aroused his blood or any rancor that might have existed in his heart or angered him, and in that anger and passion, if he raised his gun and shot his brother,—if you should find the existence of those facts beyond a reasonable doubt,—that would constitute the crime of manslaughter. But if, putting both of those aside, there was no intention in the heart of William Palmer when he entered there to kill his brother, if he was going upon this hunt, and had no thought of malice or ill will towards his brother, and no intent to do him harm, but entered the saloon for the purpose that he said he did, and passed to the opening in the screen door, and when he was in front of the door, and but a short distance from the door, if he suddenly saw a hand extended with a revolver pointing towards him, and if at the time he was impelled by fear, and apprehended at the time, as appeared to him, that he was in danger of losing his own life or in danger of great bodily harm, and if he raised his gun under those circumstances, and discharged it, and his brother's death was caused thereby, that would be excusable homicide; and the matter is to be viewed from the standpoint of William Palmer at that time when he saw that deadly weapon confronting him.

"The jury are to pass on the weight of all the evidence tending to establish any one of these different theories. But, before you can convict the respondent, you must find him guilty beyond a reasonable doubt."

6. After the first difficulty in the saloon between the two brothers, and about an hour before the tragedy, Albert went out of the saloon, and had a conversation with one Bruce and one Poquette. The conversation related to the trouble in the saloon. The respondent

stood on the sidewalk, 150 or 200 feet from him. Bruce testified that Albert said: "I won't be beat and bruised up by that bully. He is too big for me. I am not able to fight him, and, furthermore, I don't have to. I got something to aid me;" showing a box of cartridges. Albert then said to Poquette, in Bruce's presence: "What did you people up in that saloon mean by letting that man abuse me? He is too big for me. I don't want to fight him, and don't intend to. I have got something to protect myself with;" taking a revolver out of his pocket. Poquette replied: "I haven't anything to do with your troubles, Al. Didn't I take him to Bay City yesterday to keep him away from you?" Complaint is made only of the admission of the statement of Poquette, who was not produced as a witness, although upon the trial the objection was to the entire conversation. Certainly, the statements of the deceased were competent, and were favorable to the respondent, in that they showed a hostile feeling on the part of the deceased and an express threat. It was not only the right but the duty of the prosecution to place this conversation before the jury in so far as it showed the state of mind and disposition towards the respondent. The objection to its admission was raised when the testimony was offered. The judge, in admitting it, stated that he received it as a part of the *res gestae*, and confined it to such conversation as involved the relations of the brothers on the day of the homicide. This ruling is sustained by the following authorities: *People v. Potter*, 5 Mich. 5; *Brown v. People*, 17 Id. 433; *Patten v. People*, 18 Id. 327; 1 Greenl. Ev. § 108. Greenleaf says:

"Upon an inquiry as to the state of mind, sentiments, or disposition of a person at any particular period, his declarations and conversations are admissible."

The admission of the statement of Poquette to the deceased is more doubtful. The general rule is, however, that the entire conversation is admissible. It all

related to the trouble existing between the two brothers. They had just had a quarrel in a saloon at which Poquette was present. It is not the rule to include that portion of a conversation which is favorable to a party, and exclude that which may be against him. The entire conversation is admissible, and a jury may well be trusted with its consideration. We think no error was committed in admitting it.

7. Ten days after the conviction, the respondent was brought into court, and sentenced. The record does not show that the respondent was asked what he had to say why judgment should not be pronounced upon him, and for this reason it is urged that the judgment must be reversed, and a new trial ordered. The respondent's counsel was present, and made no objection to the proceeding. There had been ample time to move for a new trial or an arrest of judgment. This was never regarded as essential except in capital cases. 4 Bl. Comm. 375; *Jeffries v. Com.*, 12 Allen, 145; *West v. State*, 22 N. J. Law, 212; *McCue v. Com.*, 78 Penn. St. 185. Whatever good purpose this practice may have served in England when parties charged with crime were not allowed counsel, it is now a mere idle ceremony. But, even if the sentence were erroneous for this reason, it was not an error upon the trial, but simply an error in imposing sentence, for which the prisoner would be remanded to be sentenced afresh. *McCue v. Com.*, *supra*; *State v. Hoyt*, 47 Conn. 542.

The judgment is affirmed.

LONG and HOOKER, JJ., concurred with GRANT, J.

MONTGOMERY, J. I concur in the main in what is said in the opinion of Mr. Justice GRANT, but I am not able to agree with the proposition that the statement of Poquette, referred to in the sixth subdivision, was admissible as a part of the *res gestae*. In other respects I think the rights of the respondent were fully protected, and

that the charge is not open to the criticism contained in the opinion of the Chief Justice.

McGRATH, C. J.  I am unable to concur with my brethren in the affirmance of the judgment in the present case. It clearly appears that, on the same day and within a few hours of the shooting, deceased had been drinking freely; that he was angry and quarrelsome; that he had procured a revolver and cartridges, had exhibited them to several persons, and threatened to shoot the respondent if he ever ran in his path.  The testimony on behalf of respondent tended to show that he had procured the gun for an innocent purpose; that he was sober; had made no threats; that he came into the saloon in his usual spirits, and had exhibited no anger or vicious determination up to the very moment of the shooting; that, before the fatal shot was fired, deceased had drawn his revolver, and had fired one shot at the respondent.  Under such circumstances, the instruction referred to in paragraph numbered 5 of the opinion of Mr. Justice GRANT was, in my opinion, erroneous.  If respondent fired because deceased had first fired upon him, or because deceased had drawn his revolver and had directed it at respondent, the defense would be absolute, although respondent shot to kill.  A purpose formed under such conditions does not make the killing felonious.  The evidence of the change in respondent's countenance was that of one Adette, who says:

"The hard expression that I spoke of this morning, on William's face, did not come until just before he shot. I don't know whether it was after the revolver was discharged.  Albert shot first.  He shot at William.  It struck William; shot his finger.  I testified upon the former trial that the hard expression on William's face was just at the moment he shot Albert.  Albert shot, and he (William) shot right after.  I testified upon the former trial that when he pulled the trigger was when his face showed hard."

The witness did not tell a different story upon the last

trial respecting the change of countenance. Surely, a change of countenance under such circumstances, however cogent evidence of a purpose then formed, would not make the killing murder in the second degree.

The court further instructed the jury as follows:

"Or, if you should find the fact to be beyond a reasonable doubt that in the first intention William Palmer procured this gun for an entirely innocent purpose, and that he loaned it with it an innocent purpose, and intended to go hunting an eagle, as testified to by him, but that any time after procuring the gun, or at any time after entering the saloon, he formed a settled, deliberate purpose and intention, with malice aforethought, to take his brother's life, by shooting him with that gun, that would constitute the crime of murder; for if, at the time the shooting occurred, there was present in the mind of William Palmer this malicious purpose and intent to take Albert Palmer's life, then, no matter how quickly it was formed, or how immediately before the shooting it was formed, if it existed in the mind of William Palmer when he fired that shot, and if it was the actuating, moving cause that impelled him to fire that shot, and if you believe from the evidence beyond a reasonable doubt, giving the respondent at all times the benefit of this presumption of innocence which I have defined, but, notwithstanding that, you found him so guilty, it would be your duty to find him guilty of murder in the second degree. In other words, the state of facts I have defined would constitute the crime of murder, and you would be justified in bringing a verdict of murder in the second degree."

As abstract propositions, these instructions were undoubtedly correct, but it was error to apply them to the circumstances of the present case. The language "even though but a moment before he fired the fatal shot," or "if at the time the shooting occurred,  *  *  * no matter how quickly it was formed, or how immediately before the shooting it was formed, if it existed in the mind of William Palmer when he fired that shot," was especially directed to the moment that the shot was fired,—to a time when, according to the testimony of a

number of witnesses, respondent was looking into the muzzle of a revolver in the hands of the decedent, from which the first shot had been fired. The language applies to that very moment. It has no office unless applicable thereto. It is not a mere *lapsus lingua*, but is repeated, and is pointed in its character. It is conceded here that deceased had procured and exhibited a revolver and cartridges, avowing a purpose to shoot respondent; that he persisted in this avowal, although remonstrated with; that these threats had been communicated to respondent; that, when Albert Palmer fell, the revolver, with an empty, smoking chamber, dropped from his hand, and there was abundant testimony tending to show that he fired the first shot. Under these circumstances, the jury should have been instructed that, if respondent formed such purpose at any time before he was confronted with the revolver, he was guilty of murder in the second degree; otherwise he was not. The circumstances required that limitation, but the language used and emphasized referred to a time subsequent.

It is true that, in another part of the charge, the jury were instructed that—

"If, putting both of those aside, there was no intention in the heart of William Palmer when he entered there to kill his brother, if he was going upon this hunt, and had no thought of malice or ill will towards his brother, and no intent to do him harm, but entered the saloon for the purpose that he said he did, and passed to the opening in the screen door, and when he was in front of the door, and but a short distance from the door, if he suddenly saw a hand extended with a revolver pointing towards him, and if at the time he was impelled by fear, and apprehended at the time, as appeared to him, that he was in danger of losing his own life, or in danger of great bodily harm, and if he raised his gun under those circumstances, and discharged it, and his brother's death was caused thereby, that would be excusable homicide.'

But this is not a question as to the application of different portions of a charge to different aspects of the case,

or a failure to cover a particular view of the case made by the proofs. There was no aspect of the case to which the instruction first referred to was properly applicable. The last instruction alluded to refers to the intention with which respondent entered the saloon, and then to a state of mind produced by the circumstances,—if impelled by fear and apprehension,—but does not refer to an intent to take life then formed; while the former charge covers that very moment of time, and expressly instructs the jury that an intent to kill formed at that moment constitutes the crime of murder in the second degree.

I think, also, that the questions put to the witness Ruby should not have been allowed. The witness did not admit that he married his wife from a house of prostitution, but refused to answer the question, and was compelled to by the court. The prosecuting attorney not only persisted in asking the questions, but commented upon the fact to the jury. I cannot subscribe to a rule which permits counsel, upon the ground that it goes to the credibility of the witness, to open up the question as to the character of his wife as to chastity before her marriage with the witness. Aside from all other considerations, a proper respect for the rights of the wife and the marital relation ought to exclude that class of tesimony.

The request referred to in paragraph 3 of the majority opinion should have been given. In the instruction given, no allusion is made to the subject-matter of the request.

In my view, the respondent should be granted a new trial.