Young, J.
Defendant was charged with first-degree murder, MCL 750.316, but convicted by a jury of second-degree murder, MCL 750.317. The Court of Appeals reversed defendant’s conviction and remanded the case for a new trial, reasoning that the trial court erred when it declined to give an involuntary-manslaughter instruction. This Court granted leave to appeal to consider whether manslaughter is an “inferior” offense of murder under MCL 768.32(1), and if so, whether a rational view of the evidence supported an instruction in this case.
We conclude that manslaughter is an inferior offense of murder. However, an involuntary-manslaughter instruction was not appropriate in this case because a rational view of the evidence did not support it. Accordingly, we reverse the judgment of the Court of Appeals and reinstate defendant’s conviction. To the extent that People v Van Wyck, 402 Mich 266; 262 NW2d 638 (1978), and its progeny conflict with this opinion, they are overruled.
I. FACTS AND PROCEDURAL HISTORY
Defendant and codefendant Ivan Tims visited the home of victim William Stockdale and Stockdaie’s nephew, Thurman Chillers, with the intent to purchase marijuana. Tims initially waited outside in the car while defendant discussed the price of the drugs with Stockdale and Chillers in the house. Agreeing on a price, defendant indicated to Stockdale that he had to return to the car to get additional money. When defendant returned to the house, he *530 was accompanied by Tims. Both men brandished handguns.
Chillers testified that, upon entering the home, defendant instructed Tims to “shoot him.” In response, Tims alternately pointed his gun at Chillers and Stockdale. Stockdale, in turn, rushed at defendant, grabbed defendant’s gun and swung it downward. Chillers ran out of the house. As he ran, he saw Stockdale “tussling” with defendant. Chillers further testified that he heard one shot while he was in the house and four or five more shots when he was outside. In the end, Stockdale was shot twice, once in the leg and once in the chest. The chest wound proved fatal.
Defendant was charged with first-degree murder, MCL 750.316, and possession of a firearm during the commission of a felony, MCL 750.227b. His defense was that Tims shot Stockdale. Defendant elicited testimony from various witnesses establishing that defendant was not in the house when the victim was fatally wounded and that the fatal bullet came from a gun traceable to Tims.
At the close of proofs, defendant requested instructions for voluntary and involuntary manslaughter, MCL 750.321, and careless, reckless, or negligent discharge of a firearm, MCL 752.861. The trial court denied the requests and instructed the jury on first-degree murder, MCL 750.316, and second-degree murder, MCL 750.317. Defendant was convicted of second-degree murder and felony-firearm.
The Court of Appeals reversed defendant’s conviction and remanded the case for a new trial. The panel treated the manslaughter-instruction requests as requests for instructions on a “cognate” lesser *531 included offense and concluded that the trial court erred in refusing to give the involuntary-manslaughter instruction because there was evidence from which the jury could conclude that the victim’s death was unintended and occurred while defendant was engaged in an unlawful act not amounting to a felony. Slip op at 2.
The prosecutor applied for leave to appeal.[1] We granted leave to consider whether manslaughter is an inferior offense of murder within the meaning of MCL 768.32 and, if so, whether an involuntary-manslaughter instruction was supported by a rational view of the evidence.
II. STANDARD OF REVIEW
Whether manslaughter is an inferior offense of murder within the meaning of MCL 768.32 is a question of law that the Court reviews de novo. Weakland v Toledo Engineering Co, 467 Mich 344, 347; 656 NW2d 175 (2003).
III. ANALYSIS
A. MCL 768.32
MCL 768.32 governs inferior-offense instructions. Subsection 1 provides in pertinent part:
[U]pon an indictment for an offense, consisting of different degrees, as prescribed in this chapter, the jury, or the judge in a trial without a jury, may find the accused not guilty of the offense in the degree charged in the indictment *532 and may find the accused person guilty of a degree of that offense inferior to that charged in the indictment, or of an attempt to commit that offense.
We recently examined this statute in People v Cornell, 466 Mich 335; 646 NW2d 127 (2002).[2] In Cornell, the Court considered whether necessarily included lesser offenses[3] and cognate lesser included offenses[4] were “inferior” offenses under MCL 768.32. In consideration of this issue, we examined the meaning of the word “inferior”:
“We believe that the word ‘inferior’ in [MCL 768.32] does not refer to inferiority in the penalty associated with the offense, but, rather, to the absence of an element that distinguishes the charged offense from the lesser offense. The controlling factor is whether the lesser offense can be proved by the same facts that are used to establish the charged offense." [Cornell, supra at 354, quoting People v Torres (On Remand), 222 Mich App 411, 419-420; 564 NW2d 149 (1997)].
Relying on this definition of “inferior,” this Court concluded that MCL 768.32 only permitted consideration of necessarily included lesser offenses. Cornell, *533 supra at 353-354. Thus, we held that an inferior-offense instruction is appropriate only if the lesser offense is necessarily included in the greater offense, meaning, all the elements of the lesser offense are included in the greater offense, and a rational view of the evidence would support such an instruction.[5] Id. at 357.
B. MANSLAUGHTER IS AN INFERIOR OFFENSE OF MURDER
Manslaughter is an inferior offense of murder because manslaughter is a necessarily included lesser offense of murder.
1. THE ELEMENTS OF COMMON-LAW MURDER AND MANSLAUGHTER
Common-law murder encompasses all killings done with malice aforethought and without justification or excuse. People v Scott, 6 Mich 287, 292-293 (1859).
*534 See also People v Potter, 5 Mich 1, 6 (1858) (“Murder is where a person of sound memory and discretion unlawfully kills any reasonable creature in being, in the peace of the state, with malice prepense or aforethought, either express or implied.”).
First-degree murder is defined in MCL 750.316.[6] All other murders are murders in the second degree. MCL 750.317. See also People v Goecke, 457 Mich 442, 463-464; 579 NW2d 868 (1998), which enumerated the elements of second-degree murder as (1) death, (2) caused by defendant’s act, (3) with malice, and (4) without justification.
Manslaughter is murder without malice. See Potter, supra at 9 (noting that without malice aforethought, “a killing would be only manslaughter, if criminal at *535 all”). See also People v Palmer, 105 Mich 568, 576; 63 NW 656 (1895), remarking:
“Manslaughter is perfectly distinguishable from murder, in this: That though the act that causes death be unlawful or willful, though attended with fatal results, yet malice, either expressed or implied, which is the very essence of murder, is to be presumed to be wanting in manslaughter.” [Quoting the trial court jury instructions.]
The common law recognizes two forms of manslaughter: voluntary and involuntary. People v Townes, 391 Mich 578, 589; 218 NW2d 136 (1974).
Common-law voluntary manslaughter is defined as:
[T]he act of killing, though intentional, [is] committed under the influence of passion or in heat of blood, produced by an adequate or reasonable provocation, and before a reasonable time has elapsed for the blood to cool and reason to resume its habitual control, and is the result of the temporary excitement, by which the control of reason was disturbed, rather than of any wickedness of heart or cruelty or recklessness of disposition . . . .[Maher v People, 10 Mich 212, 219 (1862).]
See also Townes, supra at 590 (“A defendant properly convicted of voluntary manslaughter is a person who has acted out of a temporary excitement induced by an adequate provocation and not from the deliberation and reflection that marks the crime of murder.”). Thus, to show voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions. See People v *536 Pouncey, 437 Mich 382, 389; 471 NW2d 346 (1991).[7] Significantly, provocation is not an element of voluntary manslaughter. See People v Moore, 189 Mich App 315, 320; 472 NW2d 1 (1991). Rather, provocation is the circumstance that negates the presence of malice. Scott, supra at 295.
Involuntary manslaughter is the unintentional killing of another, without malice, during the commission of an unlawful act not amounting to a felony and not naturally tending to cause great bodily harm; or dining the commission of some lawful act, negligently performed; or in the negligent omission to perform a legal duty. See Townes, supra at 590. See also People v Helfin, 434 Mich 482, 507-508; 456 NW2d 10 (1990) (opinion by Riley, C.J.).
2. THE SOLE ELEMENT DISTINGUISHING MANSLAUGHTER AND MURDER IS MALICE
An examination of the historical development of homicide law informs this Court that manslaughter is a necessarily included lesser offense of murder because the elements of manslaughter are included in the offense of murder.
a. HOMICIDE IN ENGLISH COMMON LAW
In early English common law, a killing was either justifiable homicide; excusable murder committed by misadventure or accident, or in self-defense; or capi *537 tal murder, characterized by “malice aforethought” and punishable by death. See 2 Pollock and Maitland, The History of English Law (Cambridge: University Press, 1952), ch VIII, Crime and Tort, § 2, p 485. However, during the fourteenth and fifteenth centuries, an exemption called the “benefit of clergy” was widely used as a device to mitigate mandatory death sentences. Hall, Legal fictions and moral reasoning: Capital punishment and the mentally retarded defendant after Penry v Johnson, 35 Akron L R 327, 353 (2002).
The “benefit of clergy” was an exemption that allowed an offender to be sentenced by the ecclesiastical courts, which did not impose capital punishment.[8] Though it was initially intended to benefit clergy, it also benefitted persons who could satisfy its literacy test. See Kealy, Hunting the dragon: Reforming the Massachusetts murder statute, 10 B U Pub Int L J 203, 205-206 (2001). Thus, it was not long before persons other than clerics claimed the exemption, so that the “benefit of clergy” exemption benefit-ted anyone who could read. See Justice Harlan’s discussion in McGautha v California, 402 US 183, 197; 91 S Ct 1454; 28 L Ed 2d 711 (1971), noting that, although all criminal homicides were prima facie capital cases, the “benefit of clergy” was available to almost any man who could read.
In response to the exemption’s widespread availability, statutes were passed throughout the fiffcéenth and sixteenth centuries proclaiming the exemption *538 unavailable for homicides committed under particularly reviled circumstances, collectively termed “murder with malice aforethought.” Moreland, The Law of Homicide (Indianapolis: The Bobbs-Merrill Co, Inc, 1952), ch 2, The Development of Malice Aforethought, p 9. The “benefit of clergy” remained available, however, for offenders convicted of less culpable homicides. Id. Thereafter, unjustified and unexcused homicide was divided into two separate crimes: “wilful murder of malice aforethought”, a capital offense for which the “benefit of clergy” was unavailable, and manslaughter. Plucknett, A Concise History of the Common Law (New York: The Lawyers Co-Operative Pub Co, 1927), ch 2, The Felonies, pp 395-396. The critical difference between murder and manslaughter was the presence or absence of “malice aforethought.” Moreland, supra at 10.
b. “MALICE AFORETHOUGHT”
The phrase “malice aforethought” has evolved over the centuries. During the late fifteenth and early sixteenth centuries, “malice aforethought” meant that one possessed an intent to kill well in advance of the act itself. Id. at 10. Notably, the emphasis was on “aforethought,” so that the critical difference between capital and noncapital murder was the passage of time between the initial formulation of the intent to kill and the act itself. Moylan, Criminal Homicide Law (Maryland Institute for Continuing Professional Education of Lawyers), ch 2, § 2.7. The term “malice” alone had little significance beyond meaning an intent to commit an unjustified and unexcusable killing. Id. The purpose of the “malice aforethought” element was to distinguish between deliberate, calculated *539 homicides and homicides committed in the heat of passion. Kealy, supra at 206.
As more and more defendants claimed they lacked an intent to kill before the act was committed, juries and courts increasingly rejected this argument. The result was a case-by-case “semantic erosion” of the term “aforethought,” until “malice aforethought” meant nothing more than the intent to kill had to exist at the time the act was committed. Perkins & Boyce, Criminal Law (3rd ed), Murder, § 1, p 58 (“[a]s case after case came before the courts for determination . . . there came to be less and less emphasis upon the notion of a well-laid plan. And at the present day, the only requirement in this regard is that it must not be an afterthought”). There was, consequently, a parallel erosion of the distinction between capital murder, for which aforethought was required, and non-capital homicide, for which it was not.
Interestingly, although the English courts grew weary of the oft abused “lack of aforethought” defense, it was nevertheless evident that there was still some interest in distinguishing between a homicide committed in “cold blood” and one committed under circumstances that mitigated one’s culpability. To express this distinction, the focus shifted from “aforethought” to “malice.” Moreland, supra at 11 (“[t]he law of homicide seems thus to have now progressed from a place where the mental element was of no importance to a place where at the beginning of the seventeenth century it had become a factor of prime importance”).
Because there was a need to distinguish the most serious homicide from the rest, and because “aforethought” no longer had legal significance, malice *540 evolved from being merely an intent to kill to also evidencing the absence of mitigating circumstances. Moylan, supra at § 2.7. Consequently, the presence of malice became both synonymous with the absence of mitigating circumstances and the sole element distinguishing murder from manslaughter.
We glean from our examination of manslaughter’s historical development that manslaughter is defined to reflect the absence of malice. Thus, the only element distinguishing murder from manslaughter is malice.
3. MANSLAUGHTER IS A NECESSARILY LESSER INCLUDED OFFENSE OF MURDER
A necessarily lesser included offense is an offense whose elements are completely subsumed in the greater offense. Cornell, supra at 356.
Regarding voluntary manslaughter, both murder and voluntary manslaughter require a death, caused by defendant, with either an intent to kill, an intent to commit great bodily harm, or an intent to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result. However, the element distinguishing murder from manslaughter — malice—is negated by the presence of provocation and heat of passion. See Scott, supra at 295. Thus, we conclude, the elements of voluntary manslaughter are included in murder, with murder possessing the single additional element of malice.
Regarding involuntary manslaughter, the lack of malice is evidenced by involuntary manslaughter’s diminished mens rea, which is included in murder’s *541 greater mens rea. See People v Datema, 448 Mich 585, 606; 533 NW2d 272 (1995), stating:
“[Plains should be taken not to define [the mens rea required for involuntary manslaughter] in terms of a wanton and wilful disregard of a harmful consequence known to be likely to result, because such a state of mind goes beyond negligence and comes under the head of malice
Unlike murder, involuntary manslaughter contemplates an unintended result and thus requires something less than an intent to do great bodily harm, an intent to kill, or the wanton and wilful disregard of its natural consequences. [Citations omitted; emphasis added.]
See also United States v Browner, 889 F2d 549, 553 (CA 5, 1989), stating, “In contrast to the case of voluntary manslaughter . . . the absence of malice in involuntary manslaughter arises not because of provocation induced passion, but rather because the offender’s mental state is not sufficiently culpable to reach the traditional malice requirements.”
Thus, we conclude that the elements of involuntary manslaughter are included in the offense of murder because involuntary manslaughter’s mens rea is included in murder’s greater mens rea.
Accordingly, we hold the elements of voluntary and involuntary manslaughter are included in the elements of murder. Thus, both forms of manslaughter are necessarily included lesser offenses of murder. Because voluntary and involuntary manslaughter are necessarily included lesser offenses, they are also “inferior” offenses within the scope of MCL 768.32. Consequently, when a defendant is charged with murder, an instruction for voluntary and involuntary manslaughter must be given if supported by a rational view of the evidence. Cornell, supra.
*542 4. TODAY’S HOLDING IS CONSISTENT WITH EARLY MICHIGAN COMMON LAW
Today’s holding is consistent with our courts’ historical understanding of the law of murder. Michigan courts have historically concluded that a manslaughter instruction is appropriate on a murder charge if a manslaughter instruction is supported by a rational view of the evidence. See, e.g., Hanna v People, 19 Mich 316, 321 (1869) (in consideration of MCL 768.32’s similarly worded predecessor, “without this provision, the common law rule would, under the statute, dividing murder into degrees, have authorized a conviction not only for murder in the second degree, but for manslaughter also, under an indictment for murder in the first degree, all these being felonies included in the charge”) (emphasis added). See People v Treichel, 229 Mich 303, 307-308; 200 NW 950 (1924), stating:
This Court has repeatedly held, where the charge as laid includes murder in the first degree, and the proofs establish such degree, and no lesser degree, it is not error for the court to instruct the jury that, in order to convict, murder in the first degree must be found. But this court has not held, under a charge like here laid, the court must instruct the jury to find murder in the first degree or acquit. Whether such an instruction may be given or not depends upon the evidence. [Emphasis in original.]
[In this case, the] information charged murder in the first and second degrees, and this was inclusive of manslaughter. The evidence left it open for the jury to find defendants guilty of manslaughter.
See also People v Droste, 160 Mich 66, 78-79; 125 NW 87 (1910) (concluding that the trial court was “clearly warranted” in instructing the jury on manslaughter in
*543 a murder case because a jury could have concluded there was sufficient intoxication or passion to “rob [defendant’s] act of the necessary elements of murder”); People v Andrus, 331 Mich 535, 546-547; 50 NW2d 310 (1951) (remarking that it was proper for the court to submit the lesser included offenses of second-degree murder and manslaughter because the evidence was sufficient to support the offense).
It was not until this Court overlooked MCL 768.32, and introduced “cognate” lesser included offenses, that the relationship between manslaughter and murder became muddled. In People v Jones, 395 Mich 379; 236 NW2d 461 (1975), this Court, without consideration of MCL 768.32, recognized a new category of lesser included offenses called “cognate” offenses. Cognate offenses differed from necessarily included lesser offenses in that cognate offenses share with the higher offense several elements and are of the same class or category, but they contain elements not found in the higher offense. See Cornell, supra at 344-346. Faced with a category of lesser included offenses not previously recognized in Michigan, this Court, in Van Wyck, supra at 268, concluded that manslaughter was a cognate lesser included offense of murder:
We hold that manslaughter is not a necessarily included offense within the crime of murder but that it may nonetheless be an included offense if the evidence adduced at trial would support a verdict of guilty for that crime.
As we noted in People v Ora Jones, supra:
“The common-law definition of lesser included offenses is that the lesser must be such that it is impossible to commit the greater without first having committed the lesser.” [Citation omitted.]
*544 * * *
[With regard to the murder/manslaughter relationship], [t]he absence of mitigating circumstances need not be established in order to convict one of first- or second-degree murder. Consequently, it cannot be said voluntary manslaughter is a necessarily included offense within the crime of murder; it is incorrect to state that it is impossible to commit first- or second-degree murder without having first committed manslaughter. [Van Wyck, supra at 268-269.]
Notably, the Van Wyck Court failed to discuss earlier common-law decisions characterizing manslaughter as a lesser included offense of murder before cognate offenses were recognized. We also note that the Van Wyck Court did not give any consideration to the unique relationship between murder and manslaughter.
For the reasons discussed above, we conclude manslaughter is a necessarily included lesser offense of murder. We further conclude that Van Wyck’s analysis is flawed inasmuch as it is premised on a body of law recognizing cognate lesser included offenses in contravention of MCL 768.32. Accordingly, to the extent that Van Wyck and its progeny are inconsistent with this opinion and our opinion in Cornell, they are expressly overruled.
C. AN INVOLUNTARY-MANSLAUGHTER INSTRUCTION WAS NOT WARRANTED
Having concluded that manslaughter is an inferior offense of murder because it is a necessarily included lesser offense, we now consider whether the trial court erred in refusing to give an involuntary-manslaughter instruction.
*545 An inferior-offense instruction is appropriate only when a rational view of the evidence supports a conviction for the lesser offense. Cornell, supra at 357. In this case, the Court of Appeals concluded there was sufficient evidence to support an involuntary-manslaughter instruction. In reaching this conclusion, the Court relied on defendant’s statement to the police recounting what happened:
I was at a gas station on Seven Mile near Hoover when Ivan pulled up in a gray newer model car and asked me did I want some bud. Ivan asked me did I have half on it. I said, yes. I then got into the car with'Ivan. Ivan stopped by one house, then he went to the bud house. When we got to the house, Ivan stayed in the car and I went to the house. When I got to the front door, there was a big guy coming out and motioned for me just to go on in. The guy that let me in continued talking to a big dark-skinned guy with a deep voice. Another guy, kind of frail [Chillers], sitting in a love seat asked me how many I needed. I responded by saying, just one back. That’s when Ivan came to the door. Ivan started talking to the guy with the deep voice. The guy that let me in then left. I started to get my stuff from the frail guy. While I’m getting my stuff, I heard some tussling. I look back and Ivan was tussling with the big guy with the deep voice. They were tussling over a handgun with a dark barrel. While they were tussling, I heard approximately two shots. They then fell into a comer over a chair. I then heard the frail guy holler. He had pulled out a shiny revolver and pointed it at Ivan and the guy he was tussling with. I then tried to knock the gun away from [Chillers]. As I was attempting to knock the gun away from [Chillers], he pulled the trigger. I then tried to ran but I tripped over Ivan .... [Emphasis added.]
The Court of Appeals concluded that defendant’s statement that Chillers pulled the trigger when defendant tried to knock the gun away from him was sufficient to support an involuntary-manslaughter convic *546 tion. The Court reasoned that defendant’s statement could support a finding that the victim’s killing was an unintended death, without malice, and not caused by any action of defendant naturally tending to cause death.
We disagree and conclude that defendant’s statement alone is insufficient to support an involuntary-manslaughter instruction. Defendant’s statement does not indicate that the shot fired during the struggle struck or killed the victim. In fact, during his request for an involuntary-manslaughter instruction, defendant argued that the shot fired during the struggle was the nonfatal shot to the victim’s leg.[9]
Therefore, because there is no evidence that the shot fired during the struggle killed the victim, and in light of the substantial evidence that the shot was not the fatal shot, we conclude a rational view of the evidence does not support an involuntary-manslaughter instruction.
We further disagree with the conclusion of the Court of Appeals that an instruction for common-law involuntary manslaughter was premised on defendant’s theory of the case. Defendant’s theory throughout trial was that someone else was responsible for the victim’s death. Consider defendant’s opening statement, in which he sets forth his theoiy:
*547 What really occurred in this situation that you’ll see is sure, my client Mr. Mendoza and Mr. Tims went over to that location. They didn’t go over there to harm anybody. They went over there to buy what Mr. Stockdale and what Mr. Chillers were in the business to sell, which is marijuana
* * *
You’ll hear that, that Mr. Tims . . . and another person were tussling over a handgun. And while they’re tussling, shots went off. And my client went over there to try to prevent that from happening. And that’s when the tussle broke out. When my client’s running out of that location, he gets shot by Mr. Chillers.

So, it’s not my client that’s doing any shooting in there. It’s Mr. Chillers loho’s causing all these problems and doing shooting in there.

* * *
So, what happened here is after my client, after he’s running away and Mr. Chillers shoots him and he’s running to the car wounded, Mr. Tims on his own goes back up to that front door with that revolver in his hand and started shooting into the house. And that’s when Mr. Stockdale gets shot in the chest.
* * *
This is what I believe the evidence will show . . . That gun was never in the possession of Mr. Mendoza. That gun was the one identified as being in the hands of Mr. Tims when he went back on his own. [Emphasis added.]
It is, therefore, clear that defendant’s theoiy was that Tims was responsible for the victim’s death.
In sum, we conclude that a rational view of the evidence did not support an involuntary-manslaughter instruction. Therefore, it was not error for the trial *548 court to deny the instruction. Accordingly, we reverse the judgment of the Court of Appeals.
IV. CONCLUSION
Manslaughter, in both its forms, is an inferior offense of murder within the meaning of MCL 768.32. Therefore, an instruction is warranted when a rational view of the evidence would support it. Van Wyck and its progeny are overruled to the extent the Van Wyck analysis of the relationship between manslaughter and murder holds otherwise.
In this case, we conclude a rational view of the evidence did not support an involuntary-manslaughter instruction. Therefore, the trial court did not err when it refused to give the instruction. Accordingly, we reverse the judgment of the Court of Appeals and reinstate defendant’s second-degree murder conviction.
Corrigan, C.J., and Weaver, Taylor, and Markman, JJ., concurred with Young, J.

 Defendant did not cross-appeal to challenge the judgment of the Court of Appeals affirming the trial court’s decision not to give instructions on voluntary manslaughter or careless use of a firearm.

 The concurrence criticizes the construction of MCL 768.32 set forth in Cornell, arguing that the Court should apply the dictionary definition of “inferior.”
We are confident that we applied the appropriate canon of statutory construction in construing MCL 768.32 by giving “inferior offense” its common-law meaning when it was codified by the Legislature. See Pulver v Dundee Cement Co, 445 Mich 68, 75; 515 NW2d 728 (1994) (“words and phrases that have acquired a unique meaning at common law are interpreted as having the same meaning when used in statutes dealing with the same subject”).

 Necessarily included lesser offenses are offenses in which the elements of the lesser offense are completely subsumed in the greater offense. Cornell, supra at 356.

 Cognate offenses share several elements, and are of the same class or category as the greater offense, but the cognate lesser offense has some elements not found in the greater offense. Cornell, supra at 344.

 The concurrence criticizes the majority opinion for adopting “obiter dictum” from Cornell to conclude that inferior offenses are limited to necessarily included lesser offenses. We disagree with this mischaracterization of Cornell’s analysis.
In Cornell, the Court was charged with the task of construing MCL 768.32(1), because MCL 768.32(1) governs when instructions are given for “inferior” offenses. To that end, we expressly adopted Justice Coleman’s dissent in People v Jones, 395 Mich 379, 395-407; 236 NW2d 461 (1975), which would foreclose consideration of cognate lesser included offenses. Cornell, supra at 353. See also Cornell, supra at 356 n 9, in which we state, “as we have already explained, the wording of MCL 768.32 also limits consideration of lesser offenses to necessarily included lesser offenses.” We then expressly held that a requested instruction on a necessarily included lesser offense is proper if the charged greater offense requires a jury to find a disputed factual element that is not part of the lesser offense and a rational view of the evidence would support it. Id. at 357.
Accordingly, we disagree with the concurrence’s characterization of the Cornell analysis as “obiter dictum.” Rather, the Cornell discussion of the limits of MCL 768.32 was central to our construction of the statute and thus central to the resolution of the issues before the Cornell Court.

 MCL 750.316 provides in pertinent part:
(1) A person who commits any of the following is guilty of first degree murder and shall be punished by imprisonment for life:
(a) Murder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing.
(b) Murder committed in the perpetration of, or attempt to perpetrate, arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery, carjacking, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, or kidnapping.
(c) A murder of a peace officer or a corrections officer committed while the peace officer or corrections officer is lawfully engaged in the performance of any of his or her duties as a peace officer or corrections officer, knowing that the peace officer or corrections officer is a peace officer or corrections officer engaged in the performance of his or her duty as a peace officer or corrections officer.
Although first-degree murder is defined by statute, the statute is understood to include the common-law definition of murder. See People v Riddle, 467 Mich 116, 125-126; 649 NW2d 30 (2002). See also People v Utter, 217 Mich 74, 86; 185 NW 830 (1921).

 In addition to common-law manslaughter, the Legislature has also determined that manslaughter shall exist in several other circumstances. See, e.g., MCL 750.322 (the willful lolling of an unborn child by injury to its mother), MCL 750.323 (the killing of a quick child by use of medicine or an instrument), and MCL 750.329 (a killing committed without malice by means of an intentionally aimed firearm).

 The “benefit of clergy” was a political compromise between the state and the church, intended to ensure errant clerics who were convicted in the royal court were turned over to the ecclesiastical courts for sentencing.

 Defense counsel argued in support of the manslaughter instruction as follows:
Alternatively there’s also involuntary manslaughter, now that I think about it, in terms of that gun potentially accidentally [sic] going off during the struggle over the gun at the time it’s discharged. That’s how I claim, that the shot to the leg happened, when they were struggling over the gun." [Emphasis added.]
Expert testimony established that the leg wound was not the fatal injury.