*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
February 18, 2021

Plaintiff-Appellee,

v

No. 349530
Ingham Circuit Court
LC No. 18-000726-FC

JOHN RICHARD SINGLETARY,

Defendant-Appellant.

Before: M. J. KELLY, P.J., AND RONAYNE KRAUSE AND REDFORD, JJ.

PER CURIAM.

Defendant, John Singletary, appeals as of right his jury conviction of first-degree criminal sexual conduct, MCL 750.520b(1)(f) (defendant causes personal injury to the victim and uses force or coercion). For the reasons stated in this opinion, we affirm.

## I. BASIC FACTS

Singletary and the complainant knew each other for 28 years. At the time of trial, they had been married for nine years. The complainant testified that on July 29, 2018, their relationship was not good. The complainant had discovered that Singletary was video chatting with a female coworker. When confronted, Singletary told her it was a male coworker and attempted to alter his call history to support his claim. Having seen the actual call history, the complainant went outside and smashed Singletary's phone on the sidewalk, shattering the screen. She then sat on the front porch steps while Singletary yelled at her on and off for approximately 20 to 30 minutes. An eyewitness described Singletary as ranting, raving, and upset. Eventually he left to purchase alcohol. The complainant testified that after he left she shut off his cellular phone service, noting that she was not going to continue to pay for his phone on their shared plan in light of his behavior and lying.

-1-

Singletary returned to the house around midnight on July 30, 2018. He started drinking alcohol and roughly petting one of the family's cats. Eventually he got into an argument with one of the complainant's adult sons.[1] Concerned about the potential for violence, the complainant tried to separate Singletary and her son, first by asking the son to go downstairs and then by calling one of his siblings to pick him up. The son refused to leave and, although things calmed down for a while, Singletary eventually ended up pounding on the son's door, yelling and screaming. The complainant and the son both called the police: the complainant because she believed Singletary was out of control, and the son because he was scared. The officer that responded to the call observed that Singletary seemed intoxicated, but did not arrest or detain him because it did not appear that a crime had occurred.

After the police left, Singletary went to the bedroom he shared with the complainant. They watched one episode of a television show and, as another episode started, the complainant turned over to go to sleep. The complainant testified that Singletary started "feeling on me and rubbing on me." She pushed his hands away and told him that she "didn't want it." She knew he wanted to have sex, but told him "no." She testified that he started biting her, leaving visible marks. He also pulled her hair. He put his fingers inside her vagina before putting his penis inside her vagina. She testified that he told her that he loved her and that he hated her while he raped her. The complainant testified she did not call for help from her children who were in the house because she did not "want them to have that in their head."

The next morning, the complainant drove Singletary to a bank, a cellular phone store, and a fast-food restaurant before dropping him off at work. She then drove around, trying to decide what to do. Ultimately, she chose to report the assault "because it would just get worse" if she did not. The police photographed her. One of the photos showed a bruise where Singletary bit her arm. The complainant also was evaluated by a sexual assault nurse examiner (SANE). The SANE nurse's report corroborated the complainant's disclosure of Singletary biting her. There were marks near her right nipple and areola, her mouth, her arm, and her back.

The defense theory was that the complainant and Singletary engaged in consensual penile/vaginal intercourse and that the complainant only accused Singletary of raping her because she was upset by his contact with a female coworker. The jury, however, rejected his defense and convicted him of first-degree criminal sexual conduct.

## II. JUROR DISQUALIFICATION

### A. STANDARD OF REVIEW

Singletary argues that his constitutional right to be tried by an impartial jury was violated when the trial court denied his request to disqualify Juror 8. "We review for abuse of discretion a trial court's rulings on challenges for cause based on bias." *People v Williams*, 241 Mich App 519, 521; 616 NW2d 710 (2000). The court's factual findings in determining whether to excuse a juror are reviewed for clear error. *People v Miller*, 482 Mich 540, 544; 759 NW2d 850 (2008). A

---

[1] The complainant has three adult children from a prior relationship.

finding of fact is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id*.

## B. ANALYSIS

At the end of the second day of the trial, the court received a note from Juror 8 stating that she had recognized the complainant from a grocery store. On the third day of the trial, the court conducted a voir dire of Juror 8 to determine whether the juror's impartiality would be affected by her minor contact with the complainant. The juror stated that she had shopped at a market where the complainant worked. She had not spoken to the complainant outside of the usual pleasantries exchanged when checking out. She did not think that the contact would affect her ability to be fair and impartial when rendering a verdict, and she affirmed that she could apply the burden of proof, be fair to both sides, apply the presumption of innocence, listen to the evidence, and make a decision based solely upon the evidence. She did not think that the prosecutor had an easier burden of proof. She explained that she planned to "keep her distance" from the market "for a while," adding again that she did not think that the contact would influence her.

The defense lawyer then asked her a few questions:

> *Defense lawyer*. And the statement that you made was "I don't think so." Understanding that everything can't be an absolute, but, it concerns me when you say "I don't think so" because it may be some type of hesitation on your part in being able to say "Well, no, it will not affect me or yes, it will affect me." So, that's what I'm concerned with. Are you sure this will not effect [sic] you?

> *Juror 8*. I do think I have a bit of hesitation. But, to clarify, that was a little bit, it would be for, the fact that I only had positive experiences at the Apple Market. I think most of the people there are polite. I've never had negative interaction. Not that I'm like going to grocery stores to have negative interactions all the time or anything.

> *Defense lawyer*. Correct.

> *Juror 8*. I just want to be completely honest that I am pretty sure she worked there for a while and I am at that grocery store. I can't say 100% that that's going to be unbiased. I'm around like 90% sure.

> *Defense lawyer*. Okay. And the other part, for and you just stated that 90% this is not going to affect your impartiality.

> *Juror 8*. Yeah.

> *Defense lawyer*. But, then, you're gonna stop going there for whatever reason as far as however this verdict comes back, correct?

> *Juror 8*. Yes.

*Defense lawyer*. So, it is affecting you. It is affecting your mental outlook in reference to this case, correct?

*The court*. Not—, wait a minute. Now, you're going too far. I mean, she's indicated that it does not affect how she decides the case. If she decides to make some adjustment in her personal life and where she goes, then that's an adjustment in her personal life and where she shops. But, it's not an impact on how she decides this case.

Thereafter, the defense lawyer asked that the juror be excused. The court denied the request, stating:

[S]he's indicated that she can be fair and impartial. And again, if she chooses to adjust something in where she shops, that's completely understandable. But, it doesn't mean that it impacts her decision in this case. It means her decision in this case as she indicated one way or the other might change the way she shops. So, that's a vast difference than having it influence this case. So, I'm not going to excuse the juror[.]

On appeal, Singletary argues that the juror's statement that she was 90% sure was a statement that she was, in fact, 10% biased in favor of the complainant. And that, as a result, she was not an impartial juror. We disagree.

Both the United States Constitution and the Michigan Constitutional protect a criminal defendant's right to be tried by an impartial jury. US Const, Am VI; Const 1963, art I, § 20; *People v Jackson*, 292 Mich App 583, 592; 808 NW2d 541 (2011). Jurors are presumed to be impartial. *Miller*, 482 Mich at 550. "The burden is on the defendant to establish that the juror was not impartial or at least that the juror's impartiality is in reasonable doubt." *Id*. A juror may be excused for cause if he or she is "biased for or against a party." MCR 2.511(D).

The trial court credited the juror's statement that she could be fair and impartial. "This Court defers to the trial court's superior ability to assess from a venireman's demeanor whether the person would be impartial." *Williams*, 241 Mich App at 522. In this case, the trial court's finding that the juror would be impartial is supported by the record, which includes her unequivocal affirmation that she could apply the burden of proof, did not think that the prosecutor had an easier burden, would apply the presumption of innocence in Singletary's favor, and would listen to the evidence and make a decision based only on the evidence. Moreover, it is plain that the trial court viewed the juror's comment that she was "90% sure" not as an admission that she was 10% biased in favor of the complainant. Instead, as the court noted and as is supported by the juror's statements, she had a "bit of hesitation" *in continuing to shop* at the market based on her involvement in the case as a juror. We note that, the question posed to the juror before she made the 90% statement was whether she was certain she would not be *influenced*, not whether she was certain whether she could remain impartial. When faced with the trial court's questions that specifically inquired as to her ability to remain fair and impartial and to decide the case solely based upon the evidence, she indicated her belief that she could remain fair and impartial. In light of her assurances that she would be fair and impartial and considering the extremely limited nature of the juror's contact with the complainant (which consisted solely of exchanging pleasantries such

as "hello, and how are you" while the juror was in the check-out line), we are not left with a definite and firm conviction that the trial court erred by finding the juror would be fair and impartial. The trial court, therefore, did not abuse its discretion by denying the motion to excuse her from the jury.

## III. INEFFECTIVE ASSISTANCE

### A. STANDARD OF REVIEW

Singletary next argues that his lawyer's performance was constitutionally ineffective when he failed to request the jury to be instructed on the lesser included offense of third-degree criminal sexual conduct. Because no evidentiary hearing was held in the trial court, we review "for errors apparent on the record. *People v Abcumby-Blair*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 347369); slip op at 8.

### B. ANALYSIS

In order to establish that his lawyer provided ineffective assistance, the defendant must establish (1) that his lawyer provided deficient assistance, i.e., that his performance "fell below an objective standard of reasonableness," and (2) that he was prejudiced by his lawyer's deficient performance, i.e., "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *People v Gioglio (On Remand)*, 296 Mich App 12, 22; 815 NW2d 589 (2012), remanded for resentencing 493 Mich 864 (quotation marks and citation omitted). "Because there are countless ways to provide effective assistance in any given case, in reviewing a claim that counsel was ineffective courts must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. (quotation marks and citation omitted).

Singletary contends that his lawyer's performance was deficient because he did not request a jury instruction on third-degree criminal sexual conduct. An "instruction on a necessarily included lesser offense is proper if the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view of the evidence would support it." *People v Cornell*, 466 Mich 335, 357; 646 NW2d 127 (2002). In this case, a charge of third-degree criminal sexual conduct would have required the jury to find the same elements as first-degree criminal sexual conduct, save the "personal injury to the victim" element of first-degree criminal sexual conduct. Compare MCL 750.520b(1)(f) and MCL 750.520d(1)(b). Therefore, third-degree criminal sexual conduct is a necessarily included lesser offense of first-degree criminal sexual conduct. See *People v Mendoza*, 468 Mich 527, 540; 664 NW2d 685 (2003). Because the complainant's testimony supported a jury instruction on third-degree criminal sexual conduct, the trial court would have been obligated to give the instruction if Singletary's lawyer had requested it. See *People v Mills*, 450 Mich 61, 81; 537 NW2d 909 (1995).

The fact that the jury could have been instructed on third-degree criminal sexual conduct does not, however, end our inquiry. The decision to not request the trial court to instruct the jury on a lesser-included offense can constitute sound trial strategy. *People v Sardy*, 216 Mich App 111, 116; 549 NW2d 23 (1996). At trial, the defense theory was that no crime was committed because the complainant had consented to the sexual contact between herself and Singletary. Thus,

although an instruction on third-degree criminal sexual conduct was available, such an instruction was contrary to the defense that no crime had been committed. It was a reasonable trial strategy for the defense lawyer to proceed with an all-or-nothing defense as opposed to arguing to the jury that if it found nonconsensual sexual contact, it should convict of third-degree rather than first-degree criminal sexual conduct. See *People v Nickson*, 120 Mich App 681, 687; 327 NW2d 333 (1982) ("The decision to proceed with an all or nothing defense is a legitimate trial strategy.").

Singletary argues that he could have pleaded to third-degree criminal sexual conduct before the start of trial. He also contends that the failure to request an instruction on third-degree criminal sexual conduct was not harmless error because without the instruction the jury could only find him guilty or not guilty of first-degree criminal sexual conduct. Neither argument is remotely relevant to whether the defense strategy of pursuing an all or nothing defense was a legitimate trial strategy. It is the defendant's burden to overcome the presumption that his lawyer provided constitutionally effective assistance. *People v Solmonson,* 261 Mich App 657, 663; 683 NW2d 761 (2004). Here, although the defense lawyer's chosen strategy of pursuing an all-or-nothing defense was unsuccessful, it is well-established that a lawyer's performance is not constitutionally deficient just because a chosen defense strategy did not work. *People v Petri*, 279 Mich App 407, 412; 760 NW2d 882 (2008). Singletary has failed to establish that his defense lawyer's performance was constitutionally deficient.

Additionally, although he makes a cursory proclamation that the failure to request the instruction was not "harmless," he has offered nothing to show that, but for his lawyer's so-called unprofessional error of not requesting a jury instruction incompatible with the defense theory, the result of the proceedings would have been different. Having reviewed the entirety of the record, we discern no basis for a finding that Singletary was prejudiced by the allegedly deficient performance. There is not a reasonable probability that the jury would have convicted Singletary of third-degree criminal sexual conduct. The differentiating element between first-degree criminal sexual conduct and third-degree criminal sexual conduct was whether the complainant sustained a personal injury. That element was not disputed. The complainant's testimony that Singletary bit her and left marks upon her body was unrefuted and was, in fact, corroborated by photographic evidence. The only element in dispute was whether the complainant consented to the sexual penetration (and the biting "foreplay"). Thus, there is a reasonable probability that if both instructions had been given, the jury would have still convicted Singletary of first-degree criminal sexual conduct, not third-degree criminal sexual conduct because the personal-injury element was undisputed and because the jury found beyond a reasonable doubt that the complainant did not consent to the penetration and that it was accomplished with force or coercion. Singletary has wholly failed to establish that he was prejudiced by the allegedly deficient performance by his lawyer.

Affirmed.

/s/ Michael J. Kelly
/s/ Amy Ronayne Krause
/s/ James Robert Redford