*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

RICKY DALE JACK,

        Defendant-Appellant.

UNPUBLISHED
August 22, 2024

No. 364499
Ingham Circuit Court
LC No. 18-001048-FC

Before: MALDONADO, P.J., and M. J. KELLY and RICK, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of felony murder, MCL 750.316(1)(b), and first-degree child abuse, MCL 750.136b(2). The trial court sentenced defendant to life imprisonment without parole for the felony murder conviction, and to 285 to 960 months' imprisonment for the first-degree child abuse conviction. We affirm.

## I. FACTUAL BACKGROUND

Defendant was convicted in relation to the death of his four-month-old son, AJ, who died in July 2018. Trial testimony from numerous individuals painted a picture of the events leading to AJ's death. On June 30, 2018, defendant watched AJ while AJ's mother was at a work event. When she returned, she noticed that AJ had a mark on the back of his head. The following week, AJ's mother picked AJ up from his babysitter and noticed that he was not acting like himself. She testified that AJ was normally a happy and energetic baby, but seemed sad and quiet. AJ's mother went to a store and the gas station before returning home. She and defendant then got in a fight about whether she had confronted AJ's babysitters over the wound on his head. Rather than get in an argument, AJ's mother left the house to go to a manicure appointment. When she returned home, defendant told her that he had put AJ down to sleep. She attempted to go check on AJ because he was crying, but defendant said, "Don't worry about [AJ.]" AJ's mother testified that after eating dinner, she saw AJ lying "in his Pack 'n Play" in the main bedroom and assumed he was sleeping. She and defendant went to bed around midnight.

AJ's mother testified that she woke up in the middle of the night, saw that the light in the room was on, and heard defendant say "that something was wrong with [AJ]." She stated that AJ

-1-

did not respond to a flick to his eyelid and she panicked. AJ's mother averred that she saw "something a little bit darker at the lower part of [AJ's] belly." She had not seen this earlier in the day. Defendant and AJ's mother brought AJ to the hospital. A nurse opined that by the time they arrived, AJ had been dead for hours. AJ showed signs of serious internal injuries, including bleeding on his brain, bleeding in his optic nerves, multiple rib fractures, a break in his spine, and a torn liver. He also had some external injuries, including bruising on his abdomen.

A Lansing police officer was dispatched to the hospital. The officer interviewed defendant and testified that he believed defendant "didn't want to tell me a lot of information." Defendant told the officer and a medical examiner investigator that he came home around 6:00 or 6:30 p.m. and was alone with AJ after AJ's mother left around 7:30 p.m. He proceeded to play video games while AJ was in a "bouncy swing." Defendant said that AJ fell asleep and so he put him down "in the Pack 'n Play," used as a baby bed, in the main bedroom. He said that he continued to play video games until AJ's mother came home, and that they ate dinner and went to bed without disturbing AJ. Defendant told the interviewers that he awoke in the night because of the heat. He went to check AJ, felt that his body was cold, and yelled at AJ's mother to wake up. Relevant to this appeal, while at the hospital, neither AJ's mother nor defendant mentioned attempting to resuscitate AJ using CPR. CPR was likewise not mentioned during a police reenactment, in which AJ's mother and defendant described and acted out what took place the night of AJ's death using a doll. However, during a subsequent interview, defendant claimed for the first time that he tried to resuscitate AJ using CPR while AJ was on the bed and AJ's mother was in the bathroom.

A medical expert called by the prosecution testified that a child could potentially survive for days after sustaining head injuries like those inflicted on AJ, but opined that a tear to the liver like the one that AJ suffered would have caused death in minutes. The medical expert for the defense noted that AJ's liver showed both fresh and healing injuries, and opined that death occurred when something jarred AJ and "reopened" a liver wound that had already started to heal. The defense expert explained that CPR or even a bowel movement could have reopened the wound, but that nobody could actually prove what had caused AJ's injuries or the reopening of the liver. To the contrary, the prosecution theorized that the injuries occurred while AJ was in defendant's care, and that nobody else but defendant could have inflicted them. On cross-examination, the defense expert agreed that unexplained bruising on a child who is too young to walk "call[s] for a careful assessment," and later stated that it was "obvious" that the injury to AJ's head was the result of "some type of violent contact with the back of the head." When asked whether "the sheer amount of [AJ's] injuries is a red flag for abuse," the defense expert said, "It's a consideration, yes."

After the close of testimony, the jury was sent to deliberate. During deliberations, the jury sent a number of communications to the court. Relevant to this appeal, the court addressed the following two communications:

> Jury communication number four is as follows: The jury is divided based on what the intentions of the injuries to the child were, period. Whether the injuries were intent to seriously harm or kill, comma, or whether the injuries that occurred were accidental, period. Also divided on how to assess knowingly doing bodily harm or death.

Communication number five is, quote, he knowingly created a very high risk of death or great bodily harm knowing that death or such harm would be the likely result of his actions, close quote. Can this be interpreted as, colon, quote, he knowingly created a very high risk of great bodily harm knowing that such harm would be the likely result of his actions, close quotes, and then a question mark.

The parties agreed that the answer to the last question was "yes," and the jury was instructed accordingly. As for the other concern, the court stated as follows:

The law requires that each and every one of you find that each of the elements are proven beyond a reasonable doubt before you may return a verdict of guilty on the charges. You will note, however, for the purposes of the two alternate theories of Count 1, open murder, that the law states that you may find any one of the three states of mind held by the defendant at the time of the alleged act. One, that he intended to kill or, two, that he intended to do great bodily harm or, three, that he knowingly created a very high risk of death or great bodily harm knowing that death or great bodily harm would be the likely result of his actions.

As long as each of you believes that the defendant acted with one of those states of mind at the time of the alleged act and as long as each of the elements of the crimes charged are proven beyond a reasonable doubt, the People have then sustained their burden as to that element. It is not necessary that all of you unanimously agree on which of these three alternative states of mind were held by the defendant. It is only necessary that all of you agree that he possessed one of those states of mind. For instance, if you believe that he acted with the intent to kill while others feel that he acted with the intent to do great bodily harm, although you may disagree which state of mind was held by the defendant, as long as you all agree beyond a reasonable doubt that he acted with one of these states of mind which I mentioned, then that element has been proven.

Defense counsel agreed with the trial court's response and acknowledged that the court accurately stated the law. Defendant was ultimately convicted by the jury and sentenced as earlier noted. This appeal followed.

## II. ANALYSIS

Defendant argues that defense counsel was constitutionally ineffective for failing to request an accident instruction or an instruction on involuntary manslaughter, as well as for agreeing to the trial court's answer to the jury's question about intent. We disagree.

To obtain relief on the basis of ineffective assistance of counsel, a party "must show that counsel's performance fell short of [an] . . . objective standard of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the outcome of the . . . trial would have been different." *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015) (quotation marks, citation, and brackets omitted); see also *Strickland v Washington*, 466 US 668, 690, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "A reasonable probability is a probability

sufficient to undermine confidence in the outcome." *Ackley*, 497 Mich at 389 (quotation marks and citation omitted).

Defendant contends that defense counsel should have requested a jury instruction on the defense of accident. M Crim JI 7.2 states:

> (1) The defendant says that [he / she] is not guilty of ___ because ___'s death was accidental. By this defendant means that [he / she] did not mean to kill or did not realize that what [he / she] did would probably cause a death or cause great bodily harm.

> (2) If the defendant did not mean to kill, or did not realize that what [he / she] did would probably cause a death or cause great bodily harm, then [he / she] is not guilty of murder.

The use note for M Crim JI 7.2 states that the "instruction is designed for use where the defendant acknowledges the act was voluntary but the consequences unintended. It is meant to be used as a defense to a murder charge only."

In *People v Leffew*, 508 Mich 625, 643; 975 NW2d 896 (2022), our Supreme Court stated that "[i]nstructional errors that directly affect a defendant's theory of defense can infringe a defendant's due process right to present a defense." (Quotation marks and citations omitted.) However, in discussing the affirmative defense of defense of others, the *Leffew* Court added:

> In order to properly raise [a] defense, the defendant has the burden of producing some evidence from which the jury can conclude that the essential elements of the defense are present.

> The defendant's burden is not a heavy one. Even when the supporting evidence is weak or of doubtful credibility its presence requires an instruction on the theory of defense. In short, a defendant who puts forward some evidence in support of their affirmative-defense theory is entitled to an instruction on that theory. [*Id*. at 643-644 (quotation marks, citations, and brackets omitted).]

The prosecution's expert witness testified that AJ's liver injury occurred close in time to his death, whereas the defense expert witness opined that it occurred days prior and that it reopened again shortly before AJ's death. As earlier noted, the defense expert said that when AJ's original liver injury started to heal, either CPR or something as routine as a bowel movement could have caused a reopening of the liver. He opined that the cause of death was "multiple blunt force trauma and complications" but averred that there was not enough evidence to classify the death as a homicide.

Despite the defense expert's testimony, only one possible act by defendant was consistent with the defense of accident. In a statement to an officer given several days after AJ's death, and after providing several statements to medical personnel and the police regarding what happened when defendant discovered AJ's cold and lifeless body, defendant for the first and only time stated that he tried to resuscitate AJ using CPR. Defendant never mentioned CPR in earlier interviews or during a reenactment of the night AJ died. He also expressly told a friend that he had *not*

performed CPR. But even assuming that defendant did perform CPR, according to his statement to the detective, AJ was already "lifeless" when CPR was attempted. Importantly, in an earlier interview, defendant said that he awoke in the night because of the heat, went to check AJ, and felt that AJ's body was already "cold." AJ's mother likewise said that AJ was unresponsive by the time defendant woke her up in the middle of the night. An ER nurse confirmed that AJ came in with an "extremely cold" temperature, indicating that he had been dead for at least "a couple hours," which would have been before the alleged time that defendant performed CPR. As noted, evidence supporting a defense can be weak or of doubtful credibility. *Leffew*, 508 Mich 644. But here, the evidence suggests that an attempt to resuscitate AJ using CPR could not have been the "accident" that caused his death, given that the baby was deceased well before defendant allegedly tried CPR. Under these circumstances, an accident instruction was simply not in accord with the evidence. Thus, counsel's performance was not constitutionally deficient.

Defendant also contends that counsel should have requested an instruction on involuntary manslaughter. "Involuntary manslaughter is the unintentional killing of another, without malice, during the commission of an unlawful act not amounting to a felony and not naturally tending to cause great bodily harm; or during the commission of some lawful act, negligently performed; or in the negligent omission to perform a legal duty." *People v Mendoza*, 468 Mich 527, 536; 664 NW2d 685 (2003). The *Mendoza* Court additionally stated that "when a defendant is charged with murder, an instruction for voluntary and involuntary manslaughter must be given if supported by a rational view of the evidence." *Id*. at 541.

Here, a rational view of the evidence does not support the giving of an involuntary manslaughter instruction. As discussed *supra*, there was no evidence presented which would have enabled the jury to conclude that defendant unintentionally, by act or omission, caused the death of AJ. The evidence presented focused on the number of injuries AJ sustained, the agreement by both experts that he died by blunt-force trauma, defendant's inconsistent statements to others about AJ's death, and testimony by the prosecution's expert that AJ was harmed close in time with his death. Defendant argues that the defense expert's testimony supported an involuntary manslaughter or accident instruction, but the defense expert declined to offer an opinion on the manner of death, stating that it was "indeterminate." Given the lack of evidentiary support, counsel was not ineffective for failing to request an involuntary manslaughter instruction.

We further note that declining to request a certain jury instruction can constitute sound trial strategy. *People v Dunigan*, 299 Mich App 579, 584; 831 NW2d 243 (2013). Given the factual circumstances, defendant has not overcome the presumption that counsel avoided requesting an involuntary manslaughter instruction in the hope that the jury would elect to acquit him. Counsel did mention CPR very briefly in his closing argument, but the theme of the defense's trial strategy overall was that the prosecution could not meet its burden of proof because it was unclear who caused AJ's fatal injuries. Defendant has not requested a remand in this case for a *Ginther*[1] hearing. This Court must therefore evaluate his claim on the existing record. Given the evidence presented, defendant has not established the factual predicate for his ineffective assistance claim.

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

Defendant also contends that defense counsel erred by agreeing to the court's answer to the jury's question about intent. He instead argues that defense counsel should have asked that the jurors be told that an accidental injury would not satisfy the elements of murder. However, the court instructed the jurors that a conviction of murder would require that defendant "intended to kill or, two, that he intended to do great bodily harm or, three, that he knowingly created a very high risk of death or great bodily harm knowing that death or great bodily harm would be the likely result of his actions." This was adequate to convey to the jury "that a finding of accident would be inconsistent with a finding that defendant possessed the intent required for murder." See *Hawthorne*, 474 Mich at 185 (quotation marks and citation omitted). Accordingly, defense counsel was not constitutionally ineffective with regard to their approach to the jury's question.

Affirmed.

/s/ Allie Greenleaf Maldonado
/s/ Michael J. Kelly
/s/ Michelle M. Rick