# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

PEOPLE v WAFER

Docket No. 153828. Argued on application for leave to appeal October 7, 2021. Decided February 16, 2022.

Theodore P. Wafer was convicted by a jury in the Wayne Circuit Court of second-degree murder, MCL 750.317, statutory involuntary manslaughter, MCL 750.329, and carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b, for the killing of Renisha McBride. Defendant was sentenced to concurrent prison terms of 15 to 30 years for second-degree murder and 7 to 15 years for manslaughter, to be served consecutively to the two-year term of imprisonment for felony-firearm. McBride crashed her vehicle into a parked car around 1:00 a.m. in November 2013. Around 4:00 a.m., McBride arrived at defendant's home, and defendant heard someone banging on his door. Defendant retrieved his shotgun, believing that someone was trying to break into his house. He opened the door a few inches and fired his gun when he saw a person approaching the door, shooting McBride in the face and killing her. Defendant appealed his convictions, alleging, among other things, that the multiple punishments for second-degree murder and statutory involuntary manslaughter violated the Double Jeopardy Clauses of the United States and Michigan Constitutions. In an unpublished opinion, the Court of Appeals, STEPHENS, P.J., and HOEKSTRA, J. (SERVITTO, J., dissenting in part and concurring in part), concluded that defendant's convictions for these two offenses did not violate double-jeopardy protections because each offense contained different elements. Defendant sought leave to appeal in the Supreme Court, and the Supreme Court heard oral argument on defendant's claim that the jury instructions were improper, but not on the double-jeopardy issue. The Court denied leave to appeal. 501 Mich 986 (2018). Defendant moved for reconsideration, and the Supreme Court ordered and heard argument on whether to grant defendant's application or take other action regarding his double-jeopardy claim. 505 Mich 1112 (2020).

In a unanimous opinion by Justice VIVIANO, the Supreme Court, in lieu of granting leave to appeal, *held*:

Conviction of both second-degree murder and statutory involuntary manslaughter for the death of a single victim violates the multiple-punishments strand of state and federal double-jeopardy jurisprudence. Accordingly, the Court of Appeals judgment was reversed, defendant's statutory manslaughter conviction vacated, and the case remanded for resentencing.

1. Under the Michigan Constitution, Const 1963, art 1, § 15, and federal Constitution, US Const, Am V, the prohibition against double jeopardy protects individuals against (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. The "multiple punishments" strand of double jeopardy is designed to ensure that courts confine their sentences to the limits established by the Legislature, but it does not prevent the Legislature from specifically authorizing cumulative punishments under two statutes. In order to determine whether multiple punishments are, or are not, permitted, a court first looks to the ordinary meaning of the statutes to determine whether the Legislature has clearly indicated its intent to allow multiple punishments. If the intent is not clear from the text, the court then applies the abstract-legal-elements test, which provides that if each of the offenses of which the defendant was convicted has an element that the other does not, then there is no double-jeopardy violation.

2. The elements of second-degree murder, MCL 750.317, are (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse. The elements of statutory involuntary manslaughter, MCL 750.329(1), are (1) a death, (2) caused by an act of the defendant, (3) resulting from the discharge of a firearm, (4) at the time of the discharge, the defendant was intentionally pointing the firearm at the victim, and (5) the defendant did not have lawful justification or excuse for causing the death. The Legislature incorporated the common-law definition of murder into MCL 750.317, which includes the element of malice. However, the Legislature expressly excluded malice from the offense of statutory involuntary manslaughter. On the basis solely of the inconsistent language of the statutes, the natural conclusion is that a person cannot be punished under both statutes for the same conduct. Additionally, the historical evolution of the malice requirement in murder and manslaughter offenses supported that the presence of a malice requirement distinguished between the two offenses for the purpose of determining the punishment. Historically, at common law, the punishment for murder was death, whereas the punishment for manslaughter was imprisonment; therefore, punishments for both crimes could not have been cumulatively imposed.

3. Malice distinguishes murder from manslaughter, even though the "without malice" language in MCL 750.329 does not represent an element that must be proved by the prosecution to establish statutory involuntary manslaughter. "Without malice" is a negative requirement, while elements are, by definition, positive. Nevertheless, the absence of malice is fundamental to statutory involuntary manslaughter in a general definitional sense. And by requiring malice as an element of the offense of second-degree murder, while stipulating that statutory involuntary manslaughter be committed without malice, the Legislature clearly indicated its intent to prevent the prosecution from obtaining convictions and sentences for both offenses with regard to the same conduct. Further, because "without malice" is not an element of statutory involuntary manslaughter, that language would be nugatory if it failed to prevent multiple punishments because it neither defines the criminal conduct required to be proven by the prosecution nor the penalty for engaging in that conduct.

4. A different conclusion was not required by this Court's caselaw holding that statutory involuntary manslaughter was not a necessarily included lesser offense of second-degree murder. The caselaw did not address the multiple-punishments strand of the Double Jeopardy Clause. And

the fact that statutory involuntary manslaughter is not a lesser included offense does not necessarily mean that the Legislature intended to allow cumulative punishments for both crimes.

Court of Appeals judgment reversed, statutory manslaughter conviction vacated, and case remanded for resentencing.

# OPINION

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED February 16, 2022

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

No. 153828

THEODORE PAUL WAFER,

Defendant-Appellant.

BEFORE THE ENTIRE BENCH

VIVIANO, J.

Defendant Theodore Wafer was found guilty of both second-degree murder, MCL 750.317, and statutory involuntary manslaughter, MCL 750.329, and was sentenced to concurrent prison terms for those convictions. The convictions and sentences arose from defendant's shooting and killing of Renisha McBride. The issue presented in this case is whether the Double Jeopardy Clause prohibits these multiple punishments for the same homicide. We find the answer to this question in the statutory text establishing these

crimes. To be guilty of second-degree murder, MCL 750.317, an individual must have acted with malice. By contrast, the Legislature crafted the involuntary manslaughter statute to encompass certain conduct that occurred "without malice." MCL 750.329(1). By including this language, the Legislature provided a clear indication that it sought to prevent an individual from receiving punishments for both of these offenses in relation to a single homicide. Accordingly, we reverse the judgment of the Court of Appeals, which reached the opposite conclusion, and remand this case to the trial court for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of the death of Renisha McBride. On the evening of November 1, 2013, McBride left her friend's home and crashed her vehicle into a parked car around 1:00 a.m. The owner of the parked car, seeing McBride walk away from the scene in an apparently injured state, called for an ambulance. McBride left before the ambulance arrived.

It is unclear what occurred from this point until McBride arrived at defendant's home half a mile away from the crash site some three hours later. But after 4:00 a.m., defendant awoke to the sound of banging on his door. Defendant testified that he was frightened and thought someone was trying to break into his home because his neighborhood had recently experienced an increase in crime and his vehicle had recently been vandalized. Defendant retrieved his shotgun from the closet, opened the home's front door a few inches (but kept the screen door shut), saw a person come toward the door, and raised his gun and shot. Defendant shot McBride in the face, killing her. Defendant called

2

911 at 4:42 a.m. and said that he "shot somebody on [his] front porch with a shotgun banging on [his] door."

At trial, defendant admitted to shooting McBride but asserted that it was in self-defense because he thought that McBride was trying to break into his home. Defendant was convicted of second-degree murder, statutory involuntary manslaughter, and carrying a firearm during the commission of a felony (felony-firearm). Defendant was sentenced to concurrent prison terms of 15 to 30 years for the second-degree murder conviction and 7 to 15 years for the manslaughter conviction, to be served consecutively to a 2-year term of imprisonment for the felony-firearm conviction.

Defendant appealed as of right, alleging a host of errors, including that convicting him of and sentencing him for both second-degree murder and statutory involuntary manslaughter violated the Double Jeopardy Clause because statutory manslaughter must be committed without malice whereas malice is an element of second-degree murder. US Const, Am V; Const 1963 art 1, § 15. The Court of Appeals majority disagreed. Following the test set out in *People v Miller*, 498 Mich 13; 869 NW2d 204 (2015), the Court of Appeals majority first determined that the Legislature gave no clear indication of whether it wished to permit or prohibit multiple punishments. *People v Wafer*, unpublished per curiam opinion of the Court of Appeals, issued April 5, 2016 (Docket No. 324018), p 9. Therefore, the Court of Appeals majority proceeded to the second part of the *Miller* framework, comparing the abstract legal elements of each offense. *Id*. The Court of Appeals determined that defendant's two convictions did not constitute a double-jeopardy violation because each offense contained different elements. *Id*. In dissent, Judge SERVITTO would have concluded that the Legislature clearly indicated its intent to prohibit

3

multiple punishments. *Id*. at 1-2 (SERVITTO, J., dissenting in part and concurring in part). She wrote, "There would have been no need to add the limitation '*but without malice*' in the manslaughter statute had the Legislature intended to authorize dual punishments for both second degree murder and manslaughter under these circumstances." *Id*. at 3.

Defendant then sought leave to appeal in this Court. We heard argument on his claim that the jury instructions were improper but not on the double-jeopardy issue. We then denied leave to appeal. *People v Wafer*, 501 Mich 986 (2018). On defendant's motion for reconsideration, however, we granted argument on defendant's application, limited to his double-jeopardy claim. *People v Wafer*, 505 Mich 1112 (2020). The parties were directed to "address[] whether the defendant's convictions for second-degree murder, MCL 750.317, and statutory manslaughter, MCL 750.329(1), violate constitutional prohibitions against double jeopardy." *Id*. at 1113.

## II. STANDARD OF REVIEW

We review de novo questions of law regarding statutory interpretation and the application of the state and federal Constitutions. *Miller*, 498 Mich at 16-17.

## III. ANALYSIS

The issue in this case is whether defendant's dual convictions for second-degree murder and statutory involuntary manslaughter violate constitutional double-jeopardy protections. The Double Jeopardy Clause of the Fifth Amendment of the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb[.]" US Const, Am V. The Michigan Constitution similarly provides that "[n]o person shall be subject for the same offense to be twice put in jeopardy."

4

Const 1963, art 1, § 15. We have interpreted our double-jeopardy provision consistently with the federal provision. *Miller*, 498 Mich at 17 n 9.

The prohibition against double jeopardy protects individuals in three ways: (1) it protects against a second prosecution for the same offense after acquittal, (2) it protects against a second prosecution for the same offense after conviction, and (3) it protects against multiple punishments for the same offense. *People v Torres*, 452 Mich 43, 64; 549 NW2d 540 (1996), citing *United States v Wilson*, 420 US 332, 343; 95 S Ct 1013; 43 L Ed 2d 232 (1975). The first two of these three protections concern the "successive prosecutions" strand of the Double Jeopardy Clause, while the third concerns the "multiple punishments" strand, which is before us in this case. *Miller*, 498 Mich at 17.[1]

As we explained in *Miller*, the multiple-punishments strand of double jeopardy "is designed to ensure that courts confine their sentences to the limits established by the Legislature and therefore acts as a restraint on the prosecutor and the Courts." *Id*. at 17-18 (cleaned up). It therefore does not prevent the Legislature from "specifically authoriz[ing] cumulative punishment under two statutes." *Id*. at 18 (cleaned up). "Conversely, where the Legislature expresses a clear intention in the plain language of a statute to prohibit multiple punishments, it will be a violation of the multiple punishments strand for a trial court to cumulatively punish a defendant for both offenses in a single trial." *Id*. (citations

---

[1] The prosecution argues that there is no "multiple punishments" strand of double jeopardy. But this case proceeded below as a double-jeopardy case, our precedent treats it as such, no one has asked us to overrule our precedent, and the prosecution has not shown that the choice of theory would affect the outcome here, as the case ultimately comes down to the Legislature's intent as framed by the text. Therefore, we decline to address the prosecution's argument.

5

omitted). Accordingly, the question of when multiple punishments are constitutionally permissible is a matter of determining what the Legislature intended. *Id.*

In *Miller*, we set forth a two-part test to determine when multiple punishments are, or are not, permitted. The first step is to look to the ordinary meaning of the statute. If the Legislature has "clearly indicate[d] its intent with regard to the permissibility of multiple punishments," the inquiry ends here. *Id.* at 19. " 'The touchstone of legislative intent is the statute's language,' " and we accord clear and unambiguous language its ordinary meaning. *People v Hardy*, 494 Mich 430, 439; 835 NW2d 340 (2013) (citation omitted). However, if the intent is not apparent from the text, Michigan courts apply the abstract-legal-elements test under *People v Ream*, 481 Mich 223; 750 NW2d 536 (2008), and *Blockburger v United States*, 284 US 299; 52 S Ct 180; 76 L Ed 306 (1932).[2] Using this tool of statutory interpretation, if each of the offenses for which defendant was convicted

---

[2] While *Miller* referred to the need for the Legislature's intent to be "clear" before resorting to the *Blockburger* elements test, it did not suggest that courts should do anything more than they usually do when interpreting a statute, i.e., provide a fair reading of the statutory text, in light of its context, to discern its ordinary meaning. See *People v Pinkney*, 501 Mich 259, 268; 912 NW2d 535 (2018) ("When interpreting a statute, 'our goal is to give effect to the Legislature's intent, focusing first on the statute's plain language.' ") (citation omitted). To the extent we have ever recognized a true clear-statement rule in this area— i.e., a requirement that the Legislature make its meaning unmistakable, see Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 426—that rule is that the Legislature " 'ordinarily does not intend to punish the same offense under two different statutes.' " *People v Robideau*, 419 Mich 458, 470; 355 NW2d 592 (1984), overruled by *People v Smith*, 478 Mich 292, 314-316 (2007), quoting *Whalen v United States*, 445 US 684, 691-692; 100 S Ct 1432; 64 L Ed 2d 715 (1980). Thus, courts have presumed that statutes did not allow cumulative punishment if the statutes were considered to proscribe the same offense under the *Blockburger* test, but this presumption could "be rebutted by a clear indication of legislative intent . . . ." *Robideau*, 419 Mich at 470. Whatever the viability of this presumption, it has no operation in the present case. Instead, we find the clear intent through a reasonable reading of the statutory text.

has an element that the other does not, then there is no double-jeopardy violation. *Ream*, 481 Mich at 225-226.

To determine whether the Legislature authorized defendant's two convictions, we must first examine the two statutes at issue in this case. First, defendant was convicted of second-degree murder under MCL 750.317, which provides:

> All other kinds of murder shall be murder of the second degree, and shall be punished by imprisonment in the state prison for life, or any term of years, in the discretion of the court trying the same.

The elements of second-degree murder are "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868 (1998). The punishment for this offense is "life, or any term of years, in the discretion of the court." MCL 750.317.

Second, defendant was convicted of statutory involuntary manslaughter under MCL 750.329(1), which provides:

> A person who wounds, maims, or injures another person by discharging a firearm that is pointed or aimed intentionally but without malice at another person is guilty of manslaughter if the wounds, maiming, or injuries result in death.

The elements of this offense are: (1) a death, (2) caused by an act of the defendant, (3) resulting from the discharge of a firearm, (4) at the time of the discharge, the defendant was intentionally pointing the firearm at the victim, and (5) the defendant did not have lawful justification or excuse for causing the death. *People v Smith*, 478 Mich 64, 70; 731

7

NW2d 411 (2007).[3] An individual found guilty of committing this crime "shall be guilty of a felony punishable by imprisonment in the state prison, not more than 15 years or by fine of not more than 7,500 dollars, or both, at the discretion of the court." MCL 750.321.[4]

Our focus is on the threshold *Miller* question of whether the statutory text prohibits multiple punishments.[5] We believe that it does. As noted, in criminalizing second-degree murder in MCL 750.317, the Legislature incorporated the common-law definition of murder, which includes the element of malice. *People v Couch*, 436 Mich 414, 419-420; 461 NW2d 683 (1990) (recognizing that, in leaving murder undefined, the Legislature imported the common law's definition of murder into our statutes). However, in fashioning the offense of statutory manslaughter, MCL 750.329, the Legislature expressly excluded malice. As a purely textual matter, then, the language of the offenses is inconsistent, leading to the natural conclusion that the same person cannot be punished under both

---

[3] At common law, manslaughter is divided into voluntary and involuntary forms. *People v Mendoza*, 468 Mich 527, 535; 664 NW2d 685 (2003). Voluntary manslaughter concerns intentional killings committed under mitigating circumstances. *Id*. Involuntary manslaughter, by contrast, is the unintentional killing of another during the commission of an unlawful act. *People v Datema*, 448 Mich 585, 606; 533 NW2d 272 (1995) ("An unlawful act committed with the intent to injure or in a grossly negligent manner that proximately causes death is involuntary manslaughter.").

[4] MCL 750.329 does not contain its own punishment provision. MCL 750.321 is the general manslaughter statute, which imposes the above penalty on "[a]ny person who shall commit the crime of manslaughter . . . ." Because an individual found guilty under MCL 750.329 has committed manslaughter, the penalty in MCL 750.321 is applicable.

[5] Comparing the elements of the criminal offenses, it is clear that each contains an element that the other does not. The prosecution therefore argues that the *Blockburger* test is met and convictions for both crimes should be allowed. We do not, however, reach the second *Miller* inquiry because we find that the Legislature has clearly prohibited cumulative punishments in the text of the statute.

8

offenses for the same conduct.  Absent other textual indications to the contrary—and there are none here—it is hard to imagine a clearer sign that the Legislature did not intend to authorize cumulative punishments for these crimes.

This reading of the statute is consistent with the historical evolution of the malice requirement in murder and manslaughter offenses.  Manslaughter developed centuries ago as a separate offense in order to provide for a separate, less severe punishment than the death penalty applicable to homicide.  At early common law, homicide was either justifiable, excusable, or felonious.  See *People v Mendoza*, 468 Mich 527, 536-537; 664 NW2d 685 (2003).  Manslaughter grew out of the third class, felonious homicide. Coldiron, *Historical Development of Manslaughter*, 38 Ky L J 527, 527 (1950).  But at early common law, "there were no degrees of punishment for felonious homicide"; thus, "[w]hether the slayer killed by the most heinous method or upon sudden, violent provocation, his punishment was death, usually by hanging."  *Id*. at 531-532; see also 2 Pollock and Maitland, *History of English Law* (1898), § 2, p 485 (noting that all felonious homicide was punishable by death).  Thus, all felonious homicides—including those that later became manslaughter—were punishable by death.  See *Mendoza*, 468 Mich at 536-537; 4 Blackstone, Commentaries on the Laws of England, p *201.

To restrict this expansive use of the death penalty, an exemption called the "benefit of clergy" was extended to all literate persons.  *Mendoza*, 468 Mich at 537; see also Perkins, *A Re-Examination of Malice Aforethought*, 43 Yale L J 537, 541 (1934).  Under the exemption, literate offenders were "allowed . . . to be sentenced by the ecclesiastical courts, which did not impose capital punishment."  *Mendoza*, 468 Mich at 537.  To correct this "absurd distinction" between literate and illiterate offenders, the English parliament

9

began to exclude certain felonies from the benefit of clergy. *A Re-Examination of Malice Aforethought*, 43 Yale L J at 543 & n 60. In 1532, the English statute 23 Henry VIII, c 1, § 3, was enacted, providing " 'that no person or persons which shall hereafter happen to be found guilty . . . for any wilful murder of malice prepensed . . . shall from henceforth be admitted to the benefit of his or their clergy, but utterly be excluded thereof, and shall suffer death.' " Note, *The Presumption of Malice in the Law of Murder*, 8 Va L Reg 178, 183-184 (1922) (quoting statute) (alterations in original).

The effect of the statute was that "the benefit of clergy is taken away from murder through malice prepense . . . ." Blackstone, p *201. This left two classes of homicide felonies: one committed with malice aforethought for which the punishment was death and one committed without malice aforethought punishable by a brand and imprisonment not to exceed a year. *A Re-Examination of Malice Aforethought*, 43 Yale L J at 541-542. This latter form later became known as manslaughter. *Id*. at 544; *The Presumption of Malice*, 8 Va L Reg at 184 (noting that "[e]very wilful killing attributable to what in this [1532] statute is called 'malice prepensed' or 'aforethought,' . . . by judicial interpretation, were made to mean, was called murder, and all other kinds of felonious homicide came by degrees to be classified under the general name of manslaughter").

The presence of malice thus distinguished between the two offenses *for purposes* of determining the punishment. Since the punishment for murder—which includes the element of malice—was death, whereas the punishment for manslaughter—which does not include that element—was imprisonment, *A Re-Examination of Malice Aforethought*, 43 Yale L J at 541, punishments for both crimes could not have been cumulatively imposed for the same offense. The common law, consistently with this view, considered

10

manslaughter and murder to be the same offense for purposes of the prohibition of successive prosecutions. As Blackstone observed, "it has been held, that a conviction of manslaughter, on an appeal or an indictment, is a bar even in another appeal, and much more in an indictment, of murder; for the fact prosecuted is the same in both, though the offences differ in colouring and in degree." Blackstone, p *336. Thus, the historical significance of the element of malice was to ensure that murder and manslaughter stood apart and could not be cumulatively punished. We must read the term "malice" in light of this background. See MCL 8.3a ("[T]echnical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning."). So the function of the "without malice" language in MCL 750.329 is to textually signal the statute's relationship with murder crimes that include the element of malice, with regard to the effect of the malice element on the severity of the crime and applicable punishment.[6]

---

[6] Similarly, during Michigan's territorial period, the two types of homicide, murder and manslaughter, had very different punishments: death by hanging, for murder, and a fine plus up to three years at hard labor for manslaughter. See Chardavoyne, *A Hanging in Detroit: Stephen Gifford Simmons and the Last Execution Under Michigan Law* (Detroit: Wayne State University Press, 2003), p 59. Although Michigan eliminated the death penalty in May 1846, the penalty for murder remained severe: "solitary confinement at hard labor in the state prison for life" for first-degree murder, and "life[] or any term of years" for second-degree murder. 1846 RS, ch 153, §§ 1-2. And when, a few years later, the predecessor of MCL 750.329 was passed, the penalty continued to be significantly lighter than for first-degree murder: if death occurred, then the defendant was guilty of manslaughter, 1869 PA 68; 1871 CL 7550, punishable by a fine, not more than 15 years' imprisonment, or both, 1871 CL 7519. While it was then possible—as it is today—that a manslaughter conviction might, in certain cases, lead to a higher sentence than a conviction for second-degree murder, the *requirement* of imprisonment and the *possibility* of a life sentence for murder nonetheless stood in stark contrast to the possibility of a person guilty of manslaughter merely receiving a fine. Even recognizing the possibility of a greater

11

This conclusion remains valid despite the fact that the "without malice" language does not represent an element that must be proved for the crime of statutory involuntary manslaughter. In *People v Doss*, 406 Mich 90, 99; 276 NW2d 9 (1979), we held that the absence of malice was not an element that the prosecution needed to prove. In reaching this conclusion, we implicitly overruled caselaw that had understood a statutory "without malice" requirement to be an element of statutory manslaughter. Specifically, in *People v Chappell*, 27 Mich 486, 487-488 (1873), this Court set aside the defendant's conviction under a prior version of the statutory involuntary manslaughter statute because the evidence indicated he had acted maliciously. "[I]t is manifestly impossible," we noted, "for an act to be at the same time malicious and free from malice." *Id*. at 488.[7]

---

sentence for manslaughter than for second-degree murder, this Court nonetheless noted that the "distinction [between these crimes] is a vital one," relating to the lack of malice, i.e., "the greater disregard of human life shown in the higher crime." *Wellar v People*, 30 Mich 16, 19 (1874). For that reason, we suggested that one could be guilty of "murder *or* manslaughter," depending on the defendant's state of mind. *Id*. (emphasis added).

Moreover, it is worth remembering that the common law did not recognize degrees of murder, see *A Re-Examination of Malice Aforethought*, 43 Yale L J at 541, which developed in this country to provide an alternative to the death penalty. See Stacy, *Changing Paradigms in the Law of Homicide*, 62 Ohio St L J 1007, 1012 (2001). Second-degree murder nonetheless retained the malice requirement and, as shown, provided for much greater potential penalties than manslaughter. Thus, it remains clear that the malice requirement has consistently and meaningfully distinguished manslaughter from all forms of murder with regard to the penalties involved.

[7] Under *Chappell*, as under the early common law, it was simply not possible to convict a defendant for both offenses, much less impose cumulative punishments for them. The phrase "without malice" had the same function of precluding cumulative punishments with murder as it does under *Doss*, given that the prosecution would be unable to demonstrate that the defendant both acted with malice and without malice. *Doss* did not change this reality, as it never purported to address the possibility of cumulative punishments.

12

*Doss* did not disturb *Chappell*'s conclusions that the statute "was aimed at acts where no harm was designed" and that a finding of malice would be logically inconsistent with a finding of no malice. *Id*. Rather, *Doss* involved the related yet separate question of whether the absence of malice was "an essential element of manslaughter as defined in MCL 750.329[.]" *Doss*, 406 Mich at 93. Addressing this issue, we observed that our caselaw had subsequently "undermined" *Chappell*'s treatment of the "without malice" language as an element needed to be proved by the prosecution. *Id*. at 98. In particular, in *People v Chamblis*, 395 Mich 408, 424; 236 NW2d 473 (1975), we rejected the "treat[ment] as positive elements of a crime such negative concepts as [being] 'unarmed' " in an unarmed robbery statute. A negative requirement of being "unarmed," we explained, "is not a distinct, separate element. Elements are, by definition, positive." *Id*. Consequently, "[a] negative element of a crime is a contradiction in terms." *Id*.

Relying on this reasoning, *Doss* simply held that " 'without malice' is the absence of an element, rather than an additional element which the people must prove beyond a reasonable doubt." *Doss*, 406 Mich at 99. In other words, a charge of statutory involuntary manslaughter would not fail simply because the evidence demonstrated that the defendant acted with malice. Thus, a defendant could not successfully defend against a manslaughter charge by saying that he or she actually committed murder. See Tiffany, *A Treatise on the Criminal Law of the State of Michigan* (5th ed, 1900), p 973 n 89 ("But it is no defense to an indictment for manslaughter that the homicide appears by the evidence to have been committed with malice aforethought, and was therefore murder[.]"), citing *Commonwealth v McPike*, 57 Mass 181, 186 (1849). But *Doss* did not disavow—indeed, it reaffirmed— the fundamental distinction between the crimes that was introduced by the "without

13

malice" language. Malice "is that quality which distinguishes murder from manslaughter," we reiterated. *Doss*, 406 Mich at 99. Although the absence of malice was not an element of statutory involuntary manslaughter, it remained "fundamental to manslaughter in a general definitional sense[.]" *Id.* See also *Mendoza*, 468 Mich at 534 ("Manslaughter is murder without malice.") (citation omitted); *id.* at 538 ("The critical difference between murder and manslaughter was the presence or absence of 'malice aforethought.' ").

Contrary to the prosecution's argument here, the present case does not turn upon whether the absence of malice is an element of the crime; rather, the critical question is whether the Legislature has indicated its intent in the text to prohibit multiple punishments. With regard to that question, the observations in *Chappell* and *Doss* on the incompatibility of malice and absence-of-malice requirements remain valid and illuminating. By stipulating in MCL 750.329 that the crime be committed "without malice," the Legislature used language that was logically inconsistent with a showing of malice. Although the malice requirement in the second-degree murder statute is an element of the offense, while the absence of malice in the involuntary manslaughter statute is not an element of that offense, the use of inconsistent terms in the latter statute clearly indicates the Legislature's intent to prevent the prosecution from obtaining convictions and sentences for both with regard to the same conduct.

In fact, *because* the phrase "without malice" is not an element, it would be nugatory if it failed to prevent double punishments. That is, for the language to have any effect, it must prevent cumulative punishments. Otherwise, it would neither define the criminal conduct required to be proven by the prosecution nor the penalty for engaging in that conduct. As these are the core substantive aspects of criminal offenses, it is difficult to see

14

what function the language would have if it related to neither conduct nor penalty and was not procedural. See *People v Arnold*, 508 Mich ___, ___; ___ NW2d ___ (2021) (Docket No. 160046), slip op at 15-16 (describing the substantive and procedural components of criminal statutes). Because we strive, when possible, to give effect to every word and phrase in a statute, we must reject the prosecutor's proposed interpretation, which drains the meaning of "without malice" from the statute. See *People v Pinkney*, 501 Mich 259, 283-284; 912 NW2d 535 (2018).

From this perspective, the only function of the phrase "without malice" is to enable the prosecution to secure a conviction of statutory involuntary manslaughter even when the prosecution fails to prove the malice necessary for second-degree murder. And the punishment imposed in such circumstances is calibrated to firearms-related conduct. In other words, the Legislature created a specific offense that provides the prosecution with an alternative punishment that can be imposed for the intentional pointing or aiming of a firearm, even if the prosecution fails to demonstrate malice. Cf. *People v Heflin*, 434 Mich 482, 504; 456 NW2d 10 (1990) ("In our opinion, in promulgating the involuntary manslaughter statute, the Legislature intended to punish the intentional pointing of a firearm which results in death even though the defendant did not act with the criminal intent sufficient for conviction under common-law involuntary manslaughter."); see also *Chappell*, 27 Mich at 487 (opining that the statute was designed to "punish a class of acts done carelessly, but without any design of doing mischief"). Nothing in the text indicates a clear intent that the punishment for this alternate homicide offense could be imposed along with the punishment for second-degree murder.

15

Nor does our later decision in *Smith* require a different conclusion. In *Smith*, 478 Mich at 71, we examined the elements of second-degree murder and statutory involuntary manslaughter and held that the latter was not a necessarily included lesser offense of the former. We reached this conclusion because "the elements of statutory involuntary manslaughter are not completely subsumed in the elements of second-degree murder." *Id*. Specifically, we noted that the manslaughter statute required proof that the death resulted from the discharge of a firearm intentionally pointed at the victim. *Id*. Because second-degree murder did not require such a showing, it was possible to commit that crime without also committing statutory involuntary manslaughter. *Id*. While the prosecution relies on *Smith* here, that opinion did not address the multiple-punishments strand of the Double Jeopardy Clause. And the fact that statutory involuntary manslaughter is not a lesser included offense does not necessarily mean that the Legislature intended to allow cumulative punishments for both crimes.

We are aware of no cases in this state in which defendants were convicted of and received punishments for both second-degree murder and statutory involuntary manslaughter on the basis of a single killing. The outcome urged by the prosecution was not even a possibility until after both *Doss* and *Smith* were decided. As noted above, prior to *Doss* the prosecution had to prove the absence of malice to obtain a conviction of statutory involuntary manslaughter—a showing contrary to what it would need to prove to convict for second-degree murder.

For these reasons, we hold that the Legislature clearly intended to prohibit multiple punishments for second-degree murder and statutory involuntary manslaughter.

16

## IV. CONCLUSION

By requiring malice for second-degree murder but not for statutory involuntary manslaughter, the Legislature has expressed its clear intent that an individual cannot be punished for both of these offenses related to the death of a single victim. A contrary conclusion would nullify the language in MCL 750.329 that statutory involuntary manslaughter be committed "without malice." Accordingly, we reverse the Court of Appeals judgment, vacate defendant's statutory manslaughter conviction, and remand for resentencing.

David F. Viviano
Bridget M. McCormack
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch