*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KRISTOPHER HARLAN JOESEL,

        Defendant-Appellant.

UNPUBLISHED
August 29, 2024

Nos. 362388; 367180
Muskegon Circuit Court
LC No. 2020-003689-FC

Before: GADOLA, C.J., and K. F. KELLY and MARIANI, JJ.

MARIANI, J. (*dissenting*).

I respectfully dissent. In my view, the trial court reversibly erred by refusing to instruct the jury on voluntary manslaughter. Accordingly, I would vacate the defendant's conviction of second-degree murder and remand for a new trial. And because this claim of error is dispositive, I would not reach the defendant's other claims on appeal.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At approximately 1:31 a.m. on July 18, 2020, the defendant, Kristopher Harlan Joesel, fatally stabbed Laura Sanchez during a physical altercation between the two. Earlier in the evening, Joesel and his friend walked to a bar that was directly across the street from Joesel's apartment complex. Joesel had moved into the apartment complex only a few days prior, so he was unfamiliar with the bar and the people in the area. There was some dispute as to the cause, but Joesel eventually became involved in a physical altercation at the bar with bar staff and several bar patrons. Joesel dropped his phone during the altercation, and a bartender later picked it up and brought it behind the bar with him. Sanchez and her boyfriend were patrons at the bar at that time, but they were not involved in the physical altercation with Joesel. After being physically dragged out of the bar by bar staff because of the altercation, Joesel walked back to his apartment. Video surveillance footage from Joesel's apartment building showed that he returned to his apartment at 1:09 a.m. Joesel's friend returned to Joesel's apartment at 1:25 a.m. and waited in front of a locked security door within the apartment's vestibule, which was open to the public, until Joesel came downstairs, unlocked the secure door with a key fob, and let him in.

-1-

After leading his friend back to his apartment, Joesel grabbed a hunting knife and began walking back to the bar. Joesel testified at trial that he did so because he was still upset about what had occurred at the bar and "had the dumb idea to slash tires" of the cars parked near the bar. Joesel returned to the bar and, after determining that nobody from the bar was watching him, proceeded to puncture the tires of random cars near the bar, one of which, unbeknownst to him, contained Sanchez and her boyfriend. Sanchez's boyfriend testified that, as he and Sanchez were talking in his car, he felt the back part of his car "go down," and he saw Joesel walking past the car with a knife. Sanchez's boyfriend stated that Joesel was not at all focused on him or Sanchez and, instead, simply walked to the next car and punctured more tires. Sanchez and her boyfriend then got out of the car, and, as Sanchez's boyfriend asked Joesel what he had done, Sanchez approached Joesel and began yelling at him.

Joesel testified that he was startled because he did not believe that there were any other people around while he was puncturing car tires, so he immediately put his head down and began walking back to his apartment "as quickly as possible." As he did so, however, Sanchez followed him and continued to yell at him. Sanchez's boyfriend testified that he followed after her as she pursued Joesel so that he could stop her, but he was unable to keep up with her because he was recovering from foot surgery. Video surveillance footage from Joesel's apartment showed Joesel returning to the vestibule at approximately 1:27 a.m., going through the secure door, and getting onto an elevator directly in front of the vestibule to return to his apartment. The video showed Sanchez entering the vestibule and attempting to open the secure door a few seconds after Joesel had passed through it, but she was unable to do so.

An apartment resident testified that he was smoking a cigarette outside at that time and heard screaming. Sanchez then approached him and asked him to open the secure door for her, but he refused to do so because he did not know her and she seemed frantic. Sanchez, along with two or three men from the bar who had followed her to Joesel's apartment, then walked back to the bar and stood outside for a brief period of time.

Video surveillance footage from Joesel's apartment showed Joesel leaving his apartment a second time at approximately 1:31 a.m. with a knife in his hand but returning to the vestibule a few seconds later. The other apartment resident testified that he saw Joesel come out of the apartment at that time with a knife in his hand and watched him walk toward the bar before promptly turning around and walking back toward the apartment. Sanchez's boyfriend testified that he attempted to get Sanchez to go back into the bar, but, as he did so, another bar patron spotted Joesel walking toward the bar again and pointed him out to the others. When he looked up, he saw Joesel walk out of the apartment but turn around and walk back toward it after walking only partway to the street. Sanchez also saw Joesel after the individual had pointed him out and immediately ran toward Joesel's apartment to confront him again. Both the apartment resident and Sanchez's boyfriend testified that several of the bar patrons also began running toward Joesel's apartment, and Sanchez's boyfriend testified that it was "a pretty chaotic scene" on the street at that time.

The surveillance video showed Joesel, who testified that he is right-handed, entering the vestibule with the knife in his left hand, pulling the door closed behind him with his right hand as Sanchez approached the door, and retrieving the knife's sheath out of his right pocket with his right hand. Sanchez entered the vestibule as Joesel walked toward the secure door. As he did so,

Joesel switched the knife to his right hand—which, at that point, was also holding the knife's sheath—and reached with his left hand for his keys clipped to a belt loop on his left hip. Sanchez continued to walk toward Joesel and say things to him as this occurred. Joesel briefly glanced at Sanchez as she spoke but then turned his back to her as he continued to try to unhook his keys from the belt loop on his left hip. Immediately after Joesel turned his back, Sanchez ran up behind him, shoved him into a brick wall with metal mailboxes affixed to it, and grabbed onto his left arm and shoulder. Sanchez continued to hold onto Joesel's left arm and shoulder and push him as he attempted to turn around. Joesel managed to turn himself around so that he was facing Sanchez and jabbed the knife at her torso three times. Joesel stabbed Sanchez twice, once in the left ventricle of her heart and once near her groin.

The surveillance video then showed Sanchez, upon being stabbed, immediately release her grip on Joesel and back up several feet. Sanchez bled profusely as a result of her injuries. Joesel went back to trying to unlock the security door but was unable to do so on the first attempt. As he went back to the key fob reader to try again, a few men from the bar entered the vestibule. Sanchez saw the large amount of blood streaming from her chest and groin, walked toward Joesel again, and said something to him as he managed to unlock the secure door on the second attempt. Joesel looked at Sanchez as she spoke to him—with other bar patrons directly behind her—but continued through the secure door and shut it behind him. Rather than waiting for the elevator directly in front of the vestibule, Joesel walked further down the hall and took a different elevator to get to his apartment. Sanchez backed away again and, after Joesel had passed through the secure door, collapsed to the ground, apparently unconscious. Sanchez died from her injuries within a matter of minutes. Approximately 28 seconds passed between the time that Sanchez entered the vestibule and the time that she collapsed to the ground. The physical confrontation between Sanchez and Joesel, including the stabbing, occurred in less than five seconds.

All of the bar patrons who ran after Sanchez testified that they heard and saw her confront Joesel in the vestibule while they were just outside of the front door, and the video shows one of the bar patrons leaning on the doorframe while two others run up to the building from behind him. The bar patron leaning on the doorframe testified that he watched Sanchez approach Joesel and saw Joesel "shove her . . . after he had stabbed her." He also testified, however, that Sanchez "never presented her front side" to him at that time and, while he immediately "knew something had happened" because he saw blood running down her leg, it took him "probably three or four seconds" to realize what had occurred. The other bar patron and Sanchez's boyfriend both testified that they did not see Joesel stab Sanchez and had only seen Sanchez collapse to the ground bleeding as they approached the vestibule. All of the men testified that they then approached Sanchez on the ground to assist her in some way, and the video reflects them doing so. The bar patrons testified that Joesel entered the secured portion of the apartment very quickly after the stabbing, and the video shows all of the men in the vestibule as Joesel made multiple attempts to get past the secure door of the apartment.

Joesel testified that he left his apartment the second time to retrieve his phone from the bar, having realized at that point that he no longer had it on him. He testified that he still had the knife and its sheath in his pocket from when he had recently returned from puncturing car tires but began holding the knife to prevent it from poking his leg as he walked. He stated that he intended to sheath his knife as he walked toward the bar, but, as he did so, he saw Sanchez and a few other bar patrons spot him from across the street. He stated that he became scared because Sanchez and "the

group that had just beat the crap out of [him] at the bar" began yelling and running toward him, so he immediately "[p]ut [his] head down, turned around, [and] just started walking back to [his] apartment building."

Joesel testified that, when he entered the front vestibule of his apartment building, he pulled the door shut behind him in an attempt to keep Sanchez and the others from entering. He testified that he immediately turned toward the secure door, pulled the sheath out of his right pocket, and attempted to sheath the knife, but Sanchez ran into the vestibule and began yelling at him, with the rest of the group standing near the front door. Joesel stated that, at that point, he switched the knife into his right hand with the sheath so that he could reach for his keys on his left hip with his left hand. He testified that he had told Sanchez to "stop" and to "leave [him] alone" while she was yelling at him in the vestibule because he was "not trying to be confrontational," and he "was focused on using that key fob and getting in that door."

Joesel stated that he then turned his back to the group and continued to struggle with removing his keys from his belt loop when he suddenly "got slammed into the corner of the wall," which injured his left eye and cut open his thumb and index finger. He testified that his reaction was "instinctual" and that he "just tried getting the person off of [him] and get away." He further testified that he "just reacted" to being shoved from behind and had instinctively pushed Sanchez without realizing that he had actually stabbed her with the knife in his hand. He stated that he had no intention of injuring or killing Sanchez and that his only intent was to get Sanchez off of him so that he could "create distance" between them and "get away." He testified that he believed that the group of bar patrons was still following him, so he passed through the apartment's secure door and took a different route to get to his apartment rather than wait for the elevator directly in their line of sight. He stated that he was unaware that Sanchez was even injured from the altercation until he was interviewed by the police the following morning.

Joesel was tried before a jury on a charge of open murder, and he was permitted to present self-defense as a defense to murder at trial. Joesel maintained that, during the stabbing, he "acted out of passion or anger," that Sanchez was the initial aggressor, and that he did not have a reasonable time to calm down before reacting. Correspondingly, he also requested a jury instruction on voluntary manslaughter. The trial court denied Joesel's request, finding that there was insufficient evidence of adequate provocation to support the instruction. As a result, the jury was provided a verdict form that permitted it to find Joesel guilty of first-degree murder, guilty of second-degree murder, or not guilty, and the jury was instructed accordingly. The jury found Joesel guilty of second-degree murder. This appeal followed.

## II. JURY INSTRUCTIONS

Joesel argues that the trial court reversibly erred by refusing his request to instruct the jury on voluntary manslaughter as a lesser included offense of second-degree murder. I agree.

## A. PRESERVATION AND STANDARDS OF REVIEW

Joesel preserved appellate review of this issue by requesting that the trial court instruct the jury on voluntary manslaughter at trial. See *People v Everett*, 318 Mich App 511, 526; 899 NW2d 94 (2017).

We review a claim of instructional error involving a question of law de novo, but we review the trial court's determination that a jury instruction applies to the facts of the case for an abuse of discretion. Even when instructional error occurs, reversal is warranted only if after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative. The defendant bears the burden of establishing that the error undermined the reliability of the verdict. [*Id.* at 528-529 (quotation marks, citations, and alterations omitted).]

"The verdict is undermined when the evidence clearly supports the requested lesser included instruction that was not given to the jury." *People v Mitchell*, 301 Mich App 282, 286; 835 NW2d 615 (2013). This standard is met "when there is substantial evidence to support the requested instruction." *People v Cornell*, 466 Mich 335, 365; 646 NW2d 127 (2002).

B. ANALYSIS

"A criminal defendant has the right to have a properly instructed jury consider the evidence against him." *People v Head*, 323 Mich App 526, 537; 917 NW2d 752 (2018) (quotation marks and citation omitted). "One of the essential roles of the trial court is to present the case to the jury and to instruct it on the applicable law with instructions that include all the elements of the offenses charged against the defendant and any material issues, defenses, and theories that are supported by the evidence." *People v Craft*, 325 Mich App 598, 606-607; 927 NW2d 708 (2018) (quotation marks and citation omitted). "[T]he trial court is obligated to give instructions on any theory or defense supported by the evidence upon request." *People v Ogilvie*, 341 Mich App 28, 35; 989 NW2d 250 (2022). "A requested instruction on a lesser included offense is proper if the greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view of the evidence would support it." *People v Haynie*, 505 Mich 1096, 1096; 943 NW2d 383 (2020).

Voluntary manslaughter is a necessarily included lesser offense of second-degree murder. *People v Mendoza*, 468 Mich 527, 540-541; 664 NW2d 685 (2003). Accordingly, "[w]hen a defendant is charged with murder, the trial court must give an instruction on voluntary manslaughter if the instruction is 'supported by a rational view of the evidence.' " *Mitchell*, 301 Mich App at 286, quoting *Mendoza*, 468 Mich at 541.

"Both murder and voluntary manslaughter require a death, caused by defendant, with either an intent to kill, an intent to commit great bodily harm, or an intent to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result." *People v Yeager*, 511 Mich 478, 489; 999 NW2d 490 (2023) (quotation marks and citation omitted). Murder, however, "possess[es] the single additional element of malice." *People v Reese*, 491 Mich 127, 144; 815 NW2d 85 (2012) (quotation marks and citation omitted). When this malice element "is negated by the presence of provocation and heat of passion," the crime is voluntary manslaughter, not murder. *Yeager*, 511 Mich at 490 (quotation marks and citation omitted). In other words, "provocation is not an element of voluntary manslaughter," but rather "the circumstance that negates the presence of malice." *Mendoza*, 468 Mich at 536. Such mitigating circumstances are present where the defendant "kill[s] in the heat of [a] passion . . .

caused by adequate provocation" with no "lapse of time during which a reasonable person could control their passions." *Yeager*, 511 Mich at 489.

"The determination of what is reasonable provocation is a question of fact for the factfinder." *People v Pouncey*, 437 Mich 382, 390; 471 NW2d 346 (1991). Correspondingly, a trial judge may only exclude evidence of provocation "[w]hen, as a matter of law, no reasonable jury could find that the provocation was adequate[.]" *Id.* Generally speaking, "[t]he provocation must be sufficient to cause the defendant to act out of passion rather than reason, but it also must be sufficient to cause a reasonable person to lose control, not just the specific defendant." *Yeager*, 511 Mich at 489. Although words alone might at times be enough, adequate provocation often involves a physical altercation of some sort. See, e.g., *Pouncey*, 437 Mich at 391 (declining "to issue a rule that insulting words per se are never adequate provocation" given that "adequate provocation is a factual question," but finding the provocation in that case inadequate because, among other things, there was "no physical contact of any kind"); *Mitchell*, 301 Mich App at 287-288, 288 n 2 (noting that "the implication [from *Pouncey*] is that a physical altercation could constitute adequate provocation" in holding that a voluntary manslaughter instruction was warranted where the victim swore at the defendant and hit him with a baseball bat).[1] "Adequate provocation does not excuse or justify murder, but rather designates one guilty of manslaughter less culpable than one guilty of murder." *Pouncey*, 437 Mich at 392-393.

In this case, a rational view of the evidence presented at trial supported a voluntary manslaughter instruction. Joesel testified that, after returning to his apartment from puncturing car tires, he realized that he did not have his phone with him, so he left his apartment to return to the bar a second time to retrieve it. Joesel testified that he put his head down and returned to his apartment within seconds of leaving when he saw Sanchez—with a group of men from the bar who "had just beaten the crap out of" him trailing behind her—because he was afraid that there would be further confrontation. Joesel stated that he became "really scared" because he believed that he was "being hunted and followed into [his] apartment" by Sanchez and the other bar patrons. Joesel further testified that, at that point, he still had the knife in his pocket from his first trip to the bar because he had forgotten about it. He stated that he intended to sheath the knife as he walked to the bar to retrieve his phone but was interrupted by Sanchez and the other bar patrons as he attempted to do so. He further stated that he held the knife in his right hand only so that he could grab his keys from his left hip and "wouldn't get poked" in the leg as he attempted to open his apartment doors. He testified that he had told Sanchez to "stop" and to "leave [him] alone" while she was yelling at him in the vestibule because he was "not trying to be confrontational." He also testified that he "just reacted" to Sanchez shoving him from behind and had instinctively pushed her without realizing that he had stabbed her with the knife in his hand, and that his only intent was to get her off of him so that he could "create distance" between them and "get away."

---

[1] The majority posits that, "[t]o constitute adequate provocation, a battery . . . must have been a hard blow inflicting considerable pain or injury." I agree that such a battery may very well amount to adequate provocation in most if not all instances. I disagree, however, to the extent the majority suggests that anything less would necessarily fall short; indeed, *Pouncey* recognized that, in some circumstances, even words alone could be sufficient. In any event, I would conclude that, even under such a heightened standard, there was substantial evidence of adequate provocation in this case.

-6-

He testified that he believed that the group of bar patrons were still following him, so he passed through the apartment's secure door and took a different route to get to his apartment rather than wait for an elevator directly in their line of sight.

Joesel's version of the altercation was consistent with witness testimony and video surveillance footage from his apartment building. Witness testimony established that Joesel had dropped his phone near the pool table during the bar fight and that the bartender picked up Joesel's phone and brought it behind the bar. The apartment resident and Sanchez's boyfriend both testified that, immediately prior to the altercation, they saw Joesel step out of his apartment and walk toward the street before spotting Sanchez and immediately turning around to go back into his apartment. The apartment resident testified that he saw Sanchez and a few other bar patrons immediately start running after Joesel, and Sanchez's boyfriend testified that it was "a pretty chaotic scene" on the street at that time. The apartment surveillance video of the altercation shows Joesel stepping out of his apartment's vestibule but returning only a few seconds later, with Sanchez following him inside almost immediately thereafter. The video also shows Joesel ignoring Sanchez as she approached him and continued to yell at him, turning his back to her as he attempted to unlock the secured apartment door with his keys, and jabbing the knife at Sanchez immediately after she suddenly shoved him into metal mailboxes affixed to the wall and while she was still grabbing onto him. The video confirms that this altercation happened within a matter of seconds. And, consistent with Joesel's testimony that his index finger and thumb were cut by the knife when Sanchez shoved him into the wall, an investigating officer testified that both Joesel's and Sanchez's blood were found on an elevator in Joesel's apartment building and on the knife that he used to stab her.

Under "a rational view of the evidence" presented at trial, *Mendoza*, 468 Mich at 541, a reasonable jury could find in this altercation "the presence of provocation and heat of passion" sufficient to negate malice and render Joesel culpable of voluntary manslaughter, but not second-degree murder, *Yeager*, 511 Mich at 490 (quotation marks and citation omitted). By nonetheless refusing to provide the requested voluntary-manslaughter instruction, the trial court abused its discretion.[2]

---

[2] In refusing Joesel's request to provide the voluntary-manslaughter instruction, the trial court did not explain why it believed the evidence of provocation was inadequate. In opposing the request, the prosecution argued that the instruction was not warranted because Joesel had instigated the provocation by involving himself in a bar fight and subsequently using a knife to puncture the car tires of bar patrons, including Sanchez and her boyfriend. Based on the evidence presented, however, a reasonable jury could conclude that, while Joesel instigated those earlier events, he did not play such a role in the later altercation that precipitated the stabbing. Furthermore, even if a jury concluded that Joesel was the initial aggressor, it also could have reasonably concluded that Sanchez's pursuit and physical confrontation of Joesel constituted an escalation that served as adequate provocation to negate malice. Our Supreme Court has rejected "the doctrine of 'imperfect self-defense' as an independent theory that automatically mitigates criminal liability for a homicide from murder to manslaughter when a defendant acts as the initial aggressor and then claims that the victim's response necessitated the use of force"—but it has also recognized that "factual circumstances that have been characterized as imperfect self-defense may negate the

The majority grounds its conclusion otherwise in a particular view of the evidence: that Joesel "acted with calm deliberation before, during, and after the stabbing"; that he "made numerous decisions that required forethought and calculated steps"; that he "was the aggressor in every instance" and "alone escalated matters," including by acting "as if to taunt or insult Sanchez" shortly before the stabbing; and that he stabbed Sanchez in a "cold, calculated anger." I lack the majority's confidence in this view,[3] but more to the point, I fail to see how the evidence so clearly demands it that the jury should not have been permitted to even consider voluntary manslaughter as an option. As discussed, Joesel's testimony painted a different picture of the altercation and his state of mind that, on this record, "the jury could have chosen to believe." *Haynie*, 505 Mich at 1097. What is before us here is not whether we believe Joesel or think he was guilty of second-degree murder—such matters are "for the jury to decide, not appellate judges," *id.* (quotation marks and citation omitted)—nor is it even whether we think the evidence was sufficient to sustain his conviction of that offense. It is instead a narrow legal inquiry: whether "a rational view" of the evidence "would allow a jury to conclude that [Joesel] committed" voluntary manslaughter. *Id.* Indeed, the trial court could only refuse to instruct the jury on that theory of culpability if, "*as a matter of law, no reasonable jury* could find" it. *Pouncey*, 437 Mich at 390 (emphasis added). This is a demanding standard that, properly applied, ensures the jury is afforded due space and respect to perform the factfinding role with which it, and it alone, has been entrusted. I do not see how that standard has been satisfied here.

Nor can I agree with the majority that the trial court's error was harmless. Examining the "entire cause," the evidence in support of the instruction was, in my view, not just sufficient, but "substantial." *Cornell*, 466 Mich at 365 (quotation marks omitted). Between the video surveillance footage and the other testimony and evidence presented at trial, there was no meaningful dispute about the core events immediately preceding the stabbing—namely, that Sanchez (with bar patrons trailing her) pursued Joesel into his apartment building, confronted him,

---

malice element of second degree murder" and "can . . . provide grounds for a fact-finder to conclude that the prosecution has not proved the malice element that distinguishes murder from manslaughter." *Reese*, 491 Mich at 129-130, 150-151, 160. The inquiry therefore hinges on whether there was sufficient evidence of adequate provocation to mitigate the element of malice in the eyes of a reasonable jury, not whether the defendant was the initial aggressor. *Id.* at 150-151, 160. For the reasons discussed above, I believe there was sufficient—indeed, substantial—evidence to that effect in this case, and the matter should have been left to the jury to decide.

[3] I have difficulty, for instance, seeing much in the way of calm, calculation, or deliberation in Joesel's (or others') actions during the altercation and its surrounding events. Nor do I see particular aggression or escalation in Joesel's efforts to retreat into his apartment building, or evidence to substantiate an assumption that he insulted or taunted Sanchez in the process, or indication that he had any desire or intent to engage with Sanchez outside of those five seconds when she shoved him from behind into the wall and he turned and stabbed in response. And while the majority stresses the size difference between the two, the question at hand is not whether it was necessary or excusable for Joesel to respond to Sanchez's shove as he did—the jury rejected that notion (and rightly so, in my view)—but what type of murder he could be rationally found to have committed in doing so; I struggle to see how the crime of voluntary manslaughter could not fit with these facts as a matter of law.

and initiated physical contact with him by shoving him into the wall while he, with his back turned, was trying to gain access to the secure area of the building. Joesel then turned with Sanchez still holding onto him and stabbed, with the altercation spanning a few seconds. To this, Joesel added testimony about his state of mind during these events, which was the only direct evidence offered on the point and was not contradicted by any other evidence presented at trial. And defense counsel made a concerted effort during closing arguments to convince the jury that, based on the totality of the evidence presented, Joesel had acted in the "heat of passion" such that the stabbing could only constitute a "lesser crime such as manslaughter" rather than murder. There was ample evidence at trial to support this theory of the case and, again, its "believability" was "for the jury to decide." *Haynie*, 505 Mich at 1097 (quotation marks and citation omitted); see also *Pouncey*, 437 Mich at 390 ("The determination of what is reasonable provocation is a question of fact for the factfinder.").

The majority stresses that, in light of the arguments and instructions the jury heard on second-degree murder, "it is evident that the jury rejected Joesel's claim that he acted out of passion after having been provoked by Sanchez"; accordingly, "[t]he absence of the manslaughter instruction was harmless because the jury rejected the defense theory that the killing was something less than second degree murder." As both our Supreme Court and the United States Supreme Court have explained, however, the fact that the jury chose to convict Joesel of second-degree murder in this case does not necessarily tell us much about what the jury would have done had it been properly instructed on voluntary manslaughter, nor does it cure the trial court's failure to provide that instruction. See *People v Silver*, 466 Mich 386, 393 n 7; 646 NW2d 150 (2002), quoting *Keeble v United States*, 412 US 205, 212-213; 93 S Ct 1993; 36 L Ed 2d 844 (1973) (rejecting as "too facile" the argument that the absence of a lesser-offense instruction was harmless because "the jury would have acquitted defendant if it believed his testimony," given the reality that, " '[w]here one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction' "); see also *Silver*, 466 Mich at 393 n 7, quoting *Keeble*, 412 US at 212 (" '[A] defendant is entitled to a lesser offense instruction . . . precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory.' ") (ellipsis in original).

Had the jury, consistent with the theory of the case presented by Joesel, concluded he was culpable, but only of voluntary manslaughter, it "realistically could not act on [that conclusion] unless [it] had an instruction that gave [it] that choice." *Silver*, 466 Mich at 393. But the jury was not given that choice. Instead, the jury was provided a verdict form that only permitted three outcomes—guilty of first-degree murder, guilty of second-degree murder, or not guilty of either crime—which the trial court reiterated during its oral recitation of the jury instructions. If that universe of options had also included guilt of voluntary manslaughter, as it should have, the jury, in light of the evidence presented, may well have chosen that outcome instead. Nothing about its choice of second-degree murder in the absence of that option shows otherwise. To the contrary, the jury's decision to find Joesel guilty of the lowest degree of culpability offered to it would be readily compatible with a conviction of voluntary manslaughter.[4] Of course, a properly instructed

---

[4] No more telling is the jury's rejection of Joesel's claim of self-defense. That the jury chose not to entirely excuse Joesel from culpability on that theory does nothing in this case to show whether

jury might still choose second-degree murder, but that does not mean the jury need not be properly instructed, or its verdict sufficiently reliable. In my view, "[n]ot to give [the jury] an instruction that allowed [it] to agree with [Joesel's] view of the events in this case undermines the reliability of the verdict" and requires a new trial. *Id.* See also *Haynie*, 505 Mich at 1097 (citing *Silver* for this same proposition and conclusion); *People v Leffew*, 508 Mich 625, 646-652; 975 NW2d 896 (2022) (holding that, in an ineffective-assistance context, the defendant was prejudiced by the failure to provide instructions relevant to the defense's primary theory of the case because the jury was led to the theory by the attorneys' arguments but denied "a judge-given map to reach that destination").

Accordingly, I would conclude Joesel is entitled to reversal of his conviction for second-degree murder and a new trial with a properly instructed jury, to ensure that any verdict in this case is reliable under the law. See *Haynie*, 505 Mich at 1097; *Silver*, 466 Mich at 393-394.

/s/ Philip P. Mariani

---

it would have found him guilty of voluntary manslaughter. See generally *Pouncey*, 437 Mich at 392-393 ("Adequate provocation does not excuse or justify murder, but rather designates one guilty of manslaughter less culpable than one guilty of murder.").